**In re AIR CRASH DISASTER NEAR CHICAGO, ILLINOIS, ON MAY 25, 1979.**

**Lora LUX, Widow and Personal Representative of Walter H. Lux, Deceased, Plaintiff-Appellee,**

v.

**McDONNELL DOUGLAS CORPORATION, Defendant-Appellant.**

**No. 85–1224.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1985.

Decided Oct. 9, 1986.

Norman J. Barry, Rothschild Barry & Myers, Chicago, Ill., for defendant-appellant.

William J. Harte, Chicago, Ill., for plaintiff-appellee.

Before WOOD, Circuit Judge, ESCHBACH, Senior Circuit Judge, and CAMPBELL, Senior District Judge.*

ESCHBACH, Senior Circuit Judge.

Defendant McDonnell Douglas Corp. ("MDC") appeals from a judgment of $3,000,000 for plaintiff Lora Lux in this wrongful death action governed by Arizona law. The primary issues presented in this appeal are: (1) whether evidence relating to the plaintiff's receipt of insurance proceeds should have been admitted; (2) whether evidence of the decedent's income tax liability should have been admitted; and (3) whether the jury should have been instructed that its award would not be subject to taxation. For the reasons stated below, we will reverse and remand for a new trial on damages.

I

The facts, as set forth in the district court's opinion, are as follows:

On May 25, 1979, Walter Lux was killed while piloting American Airlines Flight # 191, which crashed shortly after takeoff at Chicago's O'Hare International Airport. . . .

On the date of the accident, Walter Lux was 52 years old; [his wife] Lora Lux was 49 years old, and their only son, Michael, was 22 years old. . . . Walter Lux' income from American Airlines as a captain pilot was $78,954 in 1978. In addition to his annual income, Walter Lux enjoyed various fringe benefits from his employment with American Airlines. These benefits included life insurance, medical and dental insurance, and pension benefits. At trial, plaintiff claimed a total of $1,589,930 in economic loss, of which approximately $1,000,000 represented lost income. . . .

. . . .

Walter and Lora Lux had been married 24 years at the time of the accident. . . . The Luxes had bought a summer home in Wisconsin and later remodeled the home into a year-round residence. Walter performed all of the electrical and plumbing work on the house. The Lux family lived year-round in the Wisconsin residence from 1965 until 1972. In 1972, they moved to Phoenix, Arizona. . . . [but] continued to use the Wisconsin home for vacations and holidays.

On the morning of Walter's death, Lora accompanied her husband to work at the airport in Phoenix. Walter was scheduled to pilot a plane from Phoenix to Chicago. Lora understood that Walter would fly to Chicago and then travel to the Wisconsin home to spend the Memorial Day weekend putting up wallpaper and carpeting the house. At about 1:00 p.m. that afternoon, Lora received a call at work from Walter's sister. Walter's sister informed Lora that a plane had crashed in Chicago. Lora responded that Walter was safe because he was on his way to the Wisconsin home. Unknown to Lora, however, Walter had been reassigned at the last minute to pilot Flight # 191 from Chicago to Los Angeles. Minutes after Lora spoke with Walter's sister, a friend called and told Lora that American Airlines had just informed her that Walter was the pilot on the airline which crashed. Lora immediately went home and was met by a sales representative of American Airlines.

At the house, Lora took a tranquilizer and watched reports of the crash on the television. Michael soon arrived and the sales representative then drove Lora and Michael to the Phoenix airport. Michael and Lora flew to Chicago, arriving at 6:30 a.m. on Saturday. They were met by the chief pilot for American Airlines and immediately they were introduced to the pilot originally scheduled to pilot Flight # 191. Later that morning, Lora

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, sitting by designation.

and Michael traveled to their Wisconsin home.

In Wisconsin, Lora made plans for a memorial service for Walter because she understood that Walter's body had been burned in the crash. The evening before the scheduled service, however, the funeral director informed Lora that American Airlines had sent Walter's remains for burial. Upon such short notice, Lora decided to have Walter's remains cremated.

About one month after the funeral, Lora returned to her work in Phoenix as a realtor. During this period Lora became depressed and began grinding her teeth. Lora's dentist first prescribed braces for her teeth and later surgery was required. After the surgery, however, Lora continued to grind her teeth. Lora was also treated by a psychiatrist for about one year. The psychiatrist prescribed tranquilizers in an effort to control Lora's depression.

On one occasion after the accident, Lora was flying from Chicago to Phoenix and was seated next to the Chicago fireman who first arrived at the scene of the crash. Not knowing Lora's identity, the fireman mentioned that he was the first fireman at the crash and that he "found the captain's body." On several occasions since the accident, Lora has been reminded of the crash by news reports and conversations with friends and acquaintances.

Since the accident, Lora has incurred about $13,000 in dental expenses and $1,900 in psychiatric expenses. She also has incurred the expense of hiring outside help for maintaining the Wisconsin house.

*Lux v. McDonnell Douglas Corp.,* 608 F.Supp. 98, 100–02 (N.D.Ill.1984).

Lora Lux, acting as Walter Lux's widow and the personal representative of his estate, brought suit against MDC. MDC

agreed not to contest liability for compensatory damages. The parties stipulated that the case would be governed by the law of Arizona, which was the place of residence of Walter Lux and his survivors. From February 21 to February 27, 1984, the case was tried to a jury on the issue of compensatory damages only. On February 28, 1984, the jury returned a verdict in the plaintiff's favor. It allocated $4,000,000 in damages to Lora Lux and $150,000 in damages to Michael Lux.

The district court found that, although the jury's verdict was not the result of passion, prejudice, or caprice, it was excessive. It ordered a remittitur of $1,000,000 with respect to the damages allocated to Lora Lux, which the plaintiff accepted. Lora and Michael Lux and MDC have agreed that MDC will pay $150,000 in full satisfaction of that portion of the judgment allocated to Michael Lux. MDC thus appeals from only that portion of the judgment in favor of Lora Lux.

## II

### A. *Evidence of Insurance Payments*

#### 1. *Pecuniary Damages*

The district court excluded evidence regarding the plaintiff's receipt of approximately $425,000 in insurance proceeds. MDC argues that the evidence should have been admitted as substantive evidence to reduce the plaintiff's pecuniary damages for lost support.[1] We disagree.

The collateral source (or collateral benefits) rule provides that " '[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.' " *Taylor v. Southern Pacific Transportation Co.,* 130 Ariz. 516, 519, 637 P.2d 726,

---

**1.** Under Arizona's wrongful death statute, Ariz. Rev.Stat.Ann. § 12–613, a plaintiff may recover pecuniary damages for lost support and nonpecuniary damages for loss of companionship and the plaintiff's pain and suffering.

*See Frank v. Superior Court,* 150 Ariz. 228, 722 P.2d 955 (1986); *Summerfield v. Superior Court,* 144 Ariz. 467, 482, 698 P.2d 712, 717 (1985).

729 (1981) (en banc) (quoting Restatement (Second) of Torts § 902(2) (1979)). Arizona's collateral source rule squarely bars admission of evidence concerning the plaintiff's receipt of insurance payments. *See, e.g., Michael v. Cole,* 122 Ariz. 450, 452, 595 P.2d 995, 997 (1979); *Hall v. Olague,* 119 Ariz. 73, 74–75, 579 P.2d 577, 578–79 (Ct.App.1978). Since a federal court sitting in diversity must apply the collateral source rule of the state whose law governs the case, *see Town of East Troy v. Soo Line Railroad Co.,* 653 F.2d 1123, 1132 (7th Cir.1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981), the district court properly excluded the evidence of insurance payments.

▮ MDC nevertheless asserts without citation to authority that the collateral source rule does not apply in this case because the insurance policy under which Lora Lux received payments was not purchased by Walter Lux with his own salary, but was provided by his employer. We do not agree. MDC recognizes that "insurance was as much a part of the compensation Captain Lux received from his employer as were his salary, fringe benefits, and pension benefits," Appellant's Brief 14; however, MDC does not realize the full import of this fact. To obtain life insurance as part of his compensation package, Walter Lux had to forego a higher salary than he otherwise would have received. Thus, for the purpose of Arizona's collateral source rule, his life insurance policy was purchased by him just as if he had accepted the higher salary and had written a check from his bank account to pay the premiums. *See Rustin v. Cook,* 143 Ariz. 486, 490, 694 P.2d 316, 320 (Ct.App.1984) (disability pay arising from collective bargaining agreement is a collateral benefit); *Hall,* 119 Ariz. at 74–75, 579 P.2d at 579 (military benefits that are paid for by accepting a lower salary than that which might be expected from the equivalent civilian occupation are collateral benefits).

Moreover, MDC's argument that the collateral source rule does not apply "within the employment context," Appellant's Brief 36, would not benefit MDC even if it were correct. Even if payments pursuant to an insurance policy provided as part of an employment package might reduce damages in a suit against the employer, Walter Lux's employer was American, not MDC. Since Walter Lux's insurance was not underwritten by MDC, the proceeds from that insurance cannot reduce MDC's liability for plaintiff's lost support.

Thus, the district court properly denied admission of the insurance payments for the purpose of reducing the plaintiff's damages.

2. *Nonpecuniary Damages*

▮ The plaintiff testified that her emotional distress forced her to leave work as a real estate agent. MDC sought to prove that "the actual reason for her early retirement was her new-found financial security." Appellant's Brief 37. Accordingly, it argues that evidence that the plaintiff obtained insurance benefits should have been admitted to impeach her testimony that she stopped work because of her grief. We take MDC's argument to mean that the evidence should have been admitted as substantive evidence to reduce the plaintiff's nonpecuniary damages for pain and suffering. We disagree.

Although evidence of collateral benefits is irrelevant to the amount of the plaintiff's pecuniary damages for lost support, such evidence tends to disprove the plaintiff's testimony that her emotional distress compelled her to leave her job. Thus, it is relevant under Arizona law to the amount of the plaintiff's nonpecuniary damages for pain and suffering. Whether evidence is relevant is determined by state law, but whether relevant evidence is admissible is determined by the Federal Rules of Evidence. *See In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 701 F.2d 1189, 1193, 1195 (7th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983) ("*In re Air Crash I* "). Since evidence that the plaintiff received insurance payments is relevant to the plaintiff's nonpecuniary damages under state

law, the Federal Rules of Evidence govern its admissibility.

Fed.R.Evid. 403 authorizes the district court to exclude evidence whenever its probative value is substantially outweighed by the danger of unfair prejudice. "The trial court's balancing of probative value and unfair prejudice is highly discretionary and its decision on admissibility will be accorded 'great deference.'" *West v. Love,* 776 F.2d 170, 174 (7th Cir.1985) (quoting *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir.1985)). Evidence of a plaintiff's receipt of insurance benefits carries with it the risk that a jury, in contravention of the collateral benefit rule, will reduce the plaintiff's pecuniary damages by the amount of insurance payments that he has received. As the Supreme Court recognized in an action that arose under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. ("FELA"), evidence concerning a plaintiff's "receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact," so that "the likelihood of misuse by the jury clearly outweighs the value of this evidence." *Eichel v. New York Central Railroad Co.,* 375 U.S. 253, 255, 84 S.Ct. 316, 317, 11 L.Ed.2d 307 (1963) (per curiam). Moreover, although we are not bound by Arizona's balancing of prejudice and probative value, we note that the Arizona Court of Appeals has recognized that

> although technically prohibited from doing so by the collateral source rule, juries presented with collateral source benefits evidence normally take it into consideration in assessing damages and award the plaintiff a smaller amount by reason thereof; far worse, there is the distinct possibility that, presented with such evidence after the plaintiff has claimed extensive disability, the jury will regard him as a liar whose entire cause of action

is manufactured, and will find against him on the very issue of liability.

*Young v. Environmental Air Products, Inc.,* 136 Ariz. 206, 211–12, 665 P.2d 88, 94 (Ct.App.1982) (quoting Annot. 47 A.L.R.3d 234, 238–39 (1973)), *modified,* 136 Ariz. 158, 665 P.2d 40 (Ariz.1983).

Furthermore, to the extent that evidence of insurance benefits is relevant to a plaintiff's non-pecuniary damages, there generally will be other evidence having greater probative value and less prejudicial effect. *See Eichel,* 375 U.S. at 255, 84 S.Ct. at 317; *Young,* 136 Ariz. at 212, 665 P.2d at 94. For example, MDC brought out testimony that the plaintiff quit her job not because of grief, but because she had "[l]ots of things to do at home." Tr. 312. MDC also argued to the jury that the plaintiff failed to call her psychiatrist or to produce any documents that would verify her story that she left work because of her grief. Tr. 517–19.

The district court weighed the potential for prejudice posed by evidence that the plaintiff received insurance payments against the probative value of that evidence and the availability of other evidence relevant to the amount of the plaintiff's nonpecuniary damages. It decided to exclude evidence of the receipt of insurance benefits because its probative value was substantially outweighed by the danger of unfair prejudice. We conclude that the district court did not abuse its discretion by striking this balance.[2] *See Pucalik v. Holiday Inns, Inc.,* 777 F.2d 359, 363 (7th Cir.1985).

### B. *Evidence of the Decedent's Income Taxes*

#### 1. *Arizona's Measure Of Damages*

■ The district court excluded evidence of the income taxes Walter Lux would have paid on his earnings. MDC argues that this evidence was relevant to the measure

---

**2.** MDC also asserts without citation to authority that the plaintiff waived her right to object to the introduction of evidence of the insurance payments by testifying that she left work because of her grief. We find this argument to be without merit and reject it without further discussion. We remind counsel that Fed.R.App.P. 28(a)(4) requires that argument be supported by citation to authority. *See Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986).

of damages under Arizona's wrongful death statute and, therefore, should have been admitted under the Federal Rules of Evidence. We agree.

As the Ninth Circuit has observed, "[t]he law of Arizona on the incidence of income taxes in tort damage awards is not as clear as it might be." *Felder v. United States,* 543 F.2d 657, 666 (9th Cir.1976). Arizona's wrongful death statute provides only that "[i]n an action for wrongful death, the jury shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover." Ariz. Rev.Stat.Ann. § 12–613. Whether the measure of the plaintiff's pecuniary damages for lost support in wrongful death actions is the decedent's gross income or the surviving parties' net pecuniary loss (*i.e.,* the decedent's income less personal consumption expenses and taxes) has not been decided by any Arizona court.

Indeed, prior to the Ninth Circuit's lament in *Felder,* the only Arizona case law that arguably addressed the admissibility of evidence of income taxes in a tort suit consisted of a passing statement by the state's highest court in a personal injury action. While considering whether a jury should be instructed that its award is not subject to income taxation, the Arizona Supreme Court stated that "the case should be tried on the issues and presented to the jury with a correct measure of damages, of which the incident [sic] of income tax has no part." *Mitchell v. Emblade,* 80 Ariz. 398, 405, 298 P.2d 1034, 1038 (1956). Given the context in which this statement was made, it is unclear whether *Mitchell* stands for the proposition that evidence of income taxes should not be admitted in a personal injury case, or simply that the jury in a personal injury suit should not be instructed that its award is exempt from federal income taxation.[3]

The only state court decision since *Mitchell* that has spoken to this issue is an appellate court opinion in a personal injury action. In that case, the Arizona Court of Appeals stated that "gross pay and not 'net' or 'take home' pay is the proper basis for computing loss of future earnings, and that evidence of income taxes or deductions should not be allowed for the purpose of reducing the amount of damages." *Seely v. McEvers,* 115 Ariz. 171, 174, 564 P.2d 394, 397 (Ct.App.1977).

Nonetheless, the Arizona Supreme Court's decision in *Mitchell* and the Arizona Court of Appeals' opinion in *Seely* involved personal injury actions, not wrongful death cases. Whereas the purpose of pecuniary damages in a personal injury suit is to replace a plaintiff's lost earnings, the purpose of pecuniary damages in a wrongful death action is to replace the survivors' lost support. For this reason, the survivors' pecuniary damages in wrongful death actions are reduced by the amount that the decedent would have spent on personal consumption expenses. It would seem that, since a plaintiff in a wrongful death case is entitled to the amount that the decedent would have contributed to the plaintiff's support, the plaintiff's pecuniary damages similarly should be reduced by the amount that the decedent would have paid in income taxes. *See* F. Harper, F. James & O. Gray, *The Law of Torts* § 25.12 (2d ed. 1986); S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 8.11 (1985). For this reason we have held that decisions addressing the admissibility of evidence of income taxes in personal injury cases do not govern the admissibility of such evidence in wrongful death cases. *See In re Air Crash I,* 701 F.2d at 1195–96 (discussing exact issue with respect to Illinois law). We therefore conclude that *Mitchell* and *Seely* are inapposite.

Divining in the absence of any relevant authority how a state's highest court would rule ordinarily would be as exact as foretelling the future from the flight of birds; however, in this case we have been spared

---

**3.** Whether the jury should be instructed that its award will not be taxed is a distinctly differ-

ent issue, which we will take up in section II(C).

such an exercise. The Arizona Supreme Court has repeatedly reaffirmed that, in the absence of a controlling statute or precedent, it will follow the Restatement of the Law whenever it is applicable. *See, e.g., Bank of America v. J & S Auto Repairs,* 143 Ariz. 416, 418, 694 P.2d 246, 248 (1985); *Keck v. Jackson,* 122 Ariz. 114, 115, 593 P.2d 668, 669 (1979); *Southern Pacific Transportation Co. v. Lueck,* 111 Ariz. 560, 574, 535 P.2d 599, 613 (1975); *MacNeil v. Perkins,* 84 Ariz. 74, 81, 324 P.2d 211, 215 (1958); *Bristor v. Cheatham,* 75 Ariz. 227, 236, 255 P.2d 173, 179 (1953); *Ingalls v. Neidlinger,* 70 Ariz. 40, 46, 216 P.2d 387, 390 (1950); *Waddell v. White,* 56 Ariz. 525, 527, 109 P.2d 843, 844 (1941); *Cole v. Arizona Edison Co.,* 53 Ariz. 141, 144, 86 P.2d 946, 947 (1939); *Smith v. Normart,* 51 Ariz. 134, 143, 75 P.2d 38, 42 (1938). We thus may turn to the Restatement (Second) of Torts to ascertain Arizona law on the admissibility of evidence of the decedent's income taxes in wrongful death actions.

The Restatement's position on the admissibility of evidence of income taxes in wrongful death suits is clear. In its comment to the section entitled "Effect of Taxation" on tort awards, the Restatement provides that

When the injured party dies and action is brought under a wrongful death statute, the problem before the court [as to the admissibility of evidence of income taxes] is not the same [as it is in personal injury cases]. In the majority of states, the recovery of the statutory beneficiaries is measured by the contributions that the deceased would have made to them if he had lived.... This amount obviously could not be equivalent to his gross earnings, as he could not have

given them funds that he spent on himself or paid in taxes or used for other purposes; and an appropriate percentage of his expected earnings, taking into consideration these various types of expenditures, is proper.

Restatement (Second) of Torts § 914A comment b. The Restatement thus would allow evidence of the decedent's income taxes to reduce the survivors' pecuniary damages whenever a state's wrongful death statute measures damages by the amount that the decedent would have contributed to the survivors.

Based as it is on Lord Campbell's Act,[4] Arizona's wrongful death statute, like those of the majority of the states, measures the survivors' pecuniary damages by the contributions they would have received from the decedent. *See* Tr. 549–50 (jury instruction on pecuniary damages),[5] *see also, e.g., Solomon v. Harman,* 107 Ariz. 426, 430, 489 P.2d 236, 240 (1971). Given the absence of any Arizona authority to the contrary, we believe that the Arizona Supreme Court would follow the Restatement rule by taking the decedent's income taxes, as well as his personal consumption expenses, into consideration when calculating the survivors' pecuniary damages in a wrongful death action. *Cf. In re Air Crash I,* 701 F.2d at 1195–99 (measure of damages under Illinois' wrongful death statute, which also is based on Lord Campbell's Act, is the decedent's income less personal consumption expenses and taxes). We, therefore, hold that evidence of the decedent's income taxes is relevant to plaintiff's pecuniary damages under Arizona's wrongful death statute, and, hence, should have been admitted under the Federal Rules of Evidence. *See id.* at 1195

---

**4.** Enacted by Parliament in response to *Baker v. Bolton,* 1 Camp. 493, 170 Eng.Rep. 1033 (K.B. N.P.1808), which held that there was no right of recovery for wrongful death at common law, Lord Campbell's Act provided in pertinent part that the jury should "give such damages as they may think proportioned to the injury resulting from such death to the parties, respectively," for whose benefit an action was brought.

**5.** Civil litigants are bound by the legal theories contained in the instructions to which they did not object. *See In re Innovative Construction Systems, Inc.,* 793 F.2d 875, 882 (7th Cir.1986); *Davis v. Consolidated Rail Corp.,* 788 F.2d 1260, 1268 (7th Cir.1986); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 675 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).

(evidence of decedent's income taxes that is relevant to a state's measure of damages in a wrongful death action is admissible under Fed.R.Evid. 402).[6]

■ Introduction of evidence of the decedent's income tax liability most likely would have substantially changed the jury's calculation of the plaintiff's pecuniary damages. The erroneous exclusion of such evidence thus requires us to reverse the judgment below. Because the jury returned a general verdict and did not apportion its awards for pecuniary and nonpecuniary damages, we cannot ascertain with any certainty the amount of nonpecuniary damages that the jury concluded that the plaintiff should have received for her pain and suffering and loss of companionship. As a consequence, we must remand this matter for a new trial on both pecuniary and nonpecuniary damages.

## 2. Decedent's Second Career

■ In addition to seeking pecuniary damages for the loss of the decedent's salary and fringe benefits as an airline pilot, the plaintiff sought to prove that, after her husband's mandatory retirement from American Airlines at age 60, Walter Lux would have begun a second career in real estate in Phoenix. She estimated that her husband would have earned an annual salary of approximately $50,000 from the real estate business, and would have worked in real estate for 10 years before retiring at age 70. The plaintiff's expert witness esti-

mated that the present value of these earnings before deducting 18% for the decedent's personal consumption expenses, would be approximately $235,000.

MDC endeavored to demonstrate that Captain Lux would not have embarked upon a second career in real estate. It brought forth evidence that the decedent would have received approximately $81,000 annually in pension payments. It tried to show that these pension payments would have placed the decedent in a high tax bracket so that he would have received only about $27,000 in after-tax income of the $50,000 in pre-tax income he would have earned in real estate. MDC also adduced evidence that, by pursuing a second career, the decedent would have forfeited approximately $12,000 per year in social security benefits. It attempted to argue that, since Captain Lux would have netted only about $15,000 per year ($27,000 in after-tax income less $12,000 in foregone social security payments) from his real estate business, he would not have begun a second career.

The district court allowed in evidence of the pension that the decedent would have received and the social security benefits that he would have forfeited; however, it barred MDC from introducing evidence as to the decedent's marginal tax rate and from arguing to the jury that his income tax liability would have deterred him from working in real estate. MDC argues that the district court erred by excluding such evidence and argument. We agree.

6. Federal district courts sitting in Arizona have excluded evidence of the decedent's income taxes in wrongful death actions brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2670–2680, in which Arizona law provided the measure of damages. See *McCauley v. United States*, 470 F.2d 137, 139 (9th Cir.1972) (affirming exclusion of income tax evidence); *United States v. Cline*, 410 F.2d 1337, 1343 (9th Cir.1969) (same); *United States v. Becker*, 378 F.2d 319, 324 (9th Cir. 1967) (same). The Ninth Circuit, however, has repudiated the rationale of these decisions. In *Felder v. United States*, 543 F.2d 657, 670 (9th Cir.1976), which affirmed on federal statutory grounds the admission of income tax evidence in a FTCA suit in

which Arizona law supplied the measure of damages, the Ninth Circuit made clear that in its prior opinions it had not adopted the district court's view of Arizona law, but simply had deferred to the district court's discretion when the evidence of income taxes would not have substantially affected the amount of damages. Moreover, it more recently has disclaimed its former practice of deferring to a district court's determination of state law unless it was clearly wrong, and has declared that its decisions that merely deferred to the district court's interpretation of state law are not entitled to precedential effect as expositions of state law. See *In re McLinn*, 739 F.2d 1395, 1402–03 (9th Cir. 1984) (en banc).

The sole reason for the district court's decision was its belief that evidence of the decedent's income taxes was irrelevant to the measure of the plaintiff's pecuniary damages under Arizona's wrongful death statute. *See Lux,* 608 F.Supp. at 104 n. 4. It apparently concluded that admission of such evidence for the limited purpose of proving that the decedent would have not started a second career would be unduly prejudicial. The plaintiff does not suggest any other reason why the district court should have excluded such evidence. Because we have held that evidence of the decedent's income taxes should have been admitted for the purpose of establishing the plaintiff's pecuniary damages, we believe that such evidence should also have been admitted for the purpose of proving that the decedent would not have undertaken a second career. Therefore, on remand, MDC shall be permitted to introduce such evidence and to draw reasonable inferences from that evidence in its arguments before the jury.

### C. *Nontaxability Instruction*

The district court also declined to instruct the jury that its award would not be taxed. MDC argues that such an instruction[7] was required in this case. We agree.

The Supreme Court has held, as a matter of generally applicable federal common law, that the jury should be instructed that damages for lost future wages are not subject to federal income taxation. *See Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 484–88, 101 S.Ct. 2870, 2878–80, 69 L.Ed.2d 786 (1981) (*Liepelt* "articulated a federal common-law rule."); *Norfolk & Western Railway Co. v. Liepelt,* 444 U.S. 490, 496–98, 100 S.Ct. 755, 759, 62 L.Ed.2d 689 (1980) (FELA defendant entitled to nontaxability instruction). The rationale for the federal rule is that, although most jurors are acutely aware of the effect of income taxes, few jurors appreciate that the amount of damages received on ac-

count of personal injuries is not taxable income. *See* 26 U.S.C. § 104(a)(2); *see also Liepelt,* 444 U.S. at 496, 100 S.Ct. at 759 (exemption applies to wrongful-death awards) (citing Rev. Rule 54–19, 1954–1 Cum. Bull. 179). Thus, the jury, mistakenly believing that its award will be taxed, may inflate the amount of the plaintiff's damages so that the award, less the taxes that it presumes the plaintiff must pay, equals the amount to which the jury believes that the plaintiff is entitled. *See Liepelt,* 444 U.S. at 497–98, 100 S.Ct. at 759. In contrast to the federal rule, however, Arizona law clearly states that the jury should not be instructed that its award will not be taxed. *See Mitchell v. Emblade,* 80 Ariz. 398, 403–05, 298 P.2d 1034, 1037–38 (1956); *Young v. Environmental Air Products, Inc.,* 136 Ariz. 206, 213, 665 P.2d 88, 95 (Ct.App.1982), *modified,* 136 Ariz. 158, 665 P.2d 40 (Ariz.1983). We therefore must decide whether to apply federal or state law as to the nontaxability instruction.

■ *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny generally govern conflicts between state and federal law in diversity cases; however, "[t]he *Erie* doctrine is not a monolithic legal principle to be employed in resolving all disputes as to the applicable law or procedure in diversity actions." *Platis v. Stockwell,* 630 F.2d 1202, 1204 (7th Cir.1980). Indeed, the *Erie* doctrine subsumes three distinct types of cases. *See generally* Ely, *The Irrepressible Myth of Erie,* 87 Harv.L.Rev. 693, 698 (1974). First, if a statute enacted by Congress conflicts with state law, a federal court sitting in diversity should apply federal law unless Congress exceeded its constitutional authority in enacting the statute. *See In re Air Crash I,* 701 F.2d at 1193. Second, if a duly promulgated federal rule of procedure conflicts with state law, the Rules Enabling Act, 28 U.S.C.

7. The instruction proposed by MDC provided: "Any damages you award to the plaintiff will be exempt from any income taxes. Therefore, in fixing the amount of your award, you should not be concerned about or consider the effect of taxes imposed on the award."

314

§ 2072,[8] commands a federal court to apply its rule of procedure unless to do so would abridge a substantive right under state law. *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 747, 100 S.Ct. 1978, 1983, 64 L.Ed.2d 659 (1980); *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). The third type of case arises when a federal common-law rule, which is not the subject of a congressional statute or a rule of procedure adopted by the Supreme Court under the aegis of the Rules Enabling Act, conflicts with state law; in that event, the Rules of Decision Act, 28 U.S.C. § 1652,[9] governs the choice between federal and state law. *See Hanna*, 380 U.S. at 465–68 & 468 n. 9, 85 S.Ct. at 1140–42 & n. 9; *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 984 (7th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978); *cf. Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 474 (7th Cir. 1986) (Rules of Decision Act is not limited to diversity cases). *See generally* Redish & Phillips, Erie *and the Rules of Decision Act: In Search of the Appropriate Dilemma*, 91 Harv.L.Rev. 356 (1977).

■ Since the federal rule that the jury should be instructed that its award is not subject to federal income taxation is a matter of federal common law, the Rules of Decision Act informs our choice between federal and Arizona law. Because the language of § 1652 is not self-defining, the courts have placed a judicial gloss upon the Act. The Supreme Court originally suggested that the Rules of Decision Act required the application of state law whenever the choice of law would determine the outcome of the litigation. *See Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945) (Frankfurter, J.); however, it has modified its analysis in its most recent decision (which surprisingly is over two decades old) addressing the choice of law under the Rules of Decision Act in diversity cases. In *Hanna v. Plumer*, 380 U.S. 460, 465–68 & n. 9, 85 S.Ct. 1136, 1140–42 & n. 9, 14 L.Ed.2d 8 & n. 9 (1965), a case that dealt with the validity under the Rules Enabling Act of Fed.R.Civ.P. 4(d)(1), the Court indicated in dicta that state law should be applied whenever the choice of federal law would encourage forum-shopping or would lead to an inequitable administration of its laws. In decisions of our own, we have expanded the Court's exegesis of the Act. *See, e.g., Roberts v. Sears, Roebuck & Co.*, 573 F.2d at 984–85 (federal law should be applied when policy underlying the state rule is merely procedural).

In particular, we have previously addressed the choice between federal and state law as to whether the jury should be instructed that its award is tax exempt. *See In re Air Crash I*, 701 F.2d at 1199–1200. In that case, a nontaxability instruction was required by federal common law, but was barred by Illinois law. We held that federal law should be applied unless Illinois had a substantive interest for re-

**8.** The Rules Enabling Act provides in pertinent part:

The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts and courts of appeals of the United States in civil actions, including admiralty and maritime cases, and appeals therein, and the practice and procedure in proceedings for the review by the courts of appeals of decisions of the Tax Court of the United States and for the judicial review or enforcement of orders of administrative agencies, boards, commissions, and officers.

Such rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution. 28 U.S.C. § 2072.

**9.** Enacted by the First Congress as § 34 of the Federal Judiciary Act of 1789, 1 Stat. 92, the Rules of Decision Act provides:

The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply. 28 U.S.C. § 1652. For an excellent discussion of the Act's legislative history, see Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv.L.Rev. 49, 81–88 (1923).

fusing the instruction. The Illinois Supreme Court had articulated three grounds for not giving the instruction: It would deprive the plaintiff of a tax benefit intended by Congress; it is unnecessary if the jury is instructed on the proper measure of damages; and it would invite a flood of cautionary instructions. *See Hall v. Chicago & North Western Railway*, 5 Ill.2d 135, 148–53, 125 N.E.2d 77, 84–86 (1955); *see also Klawonn v. Mitchell*, 105 Ill.2d 450, 86 Ill.Dec. 478, 475 N.E.2d 857 (1985) (reaffirming state practice of refusing nontaxability instruction). We found that the first reason was incorrect as a matter of federal law because the Supreme Court had held that Congress, by excluding personal-injury awards from taxable income, did not intend to confer a tax benefit upon plaintiffs. *See Liepelt*, 444 U.S. at 496 n. 10, 100 S.Ct. at 759 n. 10. We concluded that the other two interests articulated by the Illinois Supreme Court "should not bind a federal court because they speak to matters of court administration, about which the federal courts have independent competence." *In re Air Crash I*, 701 F.2d at 1200. Hence, we held that, since Illinois did not have a substantive reason for refusing the instruction, federal law should apply.

Therefore, to determine whether state or federal law should be applied in this case, we must examine the grounds for refusing the instruction that have been expressed by the Arizona courts. The Arizona Supreme Court also has asserted three reasons: the instruction would complicate the trial; it is unnecessary if the jury is instructed on the proper measure of damages; and it would invite a flood of cautionary instructions. *See Mitchell*, 80 Ariz. at 403–05, 298 P.2d at 1037–38. As was true of the latter interests articulated by the Illinois Supreme Court in *Hall*,[10] the reasons expressed by the Arizona Supreme Court in *Mitchell* are merely procedural. By refusing the nontaxability instruction, Arizona simply seeks to regulate the internal procedure of its courts; it does not seek to regulate primary conduct of its citizens or to favor a particular class of litigants. *See* Redish & Phillips, 91 Harv.L.Rev. at 394–400 (state interest in regulating its docket is entitled to less weight than an interest in regulating primary conduct or favoring a class of litigants). Since Arizona has not articulated a substantive interest for not giving the instruction, federal law should apply.

We therefore hold that in this diversity case governed by Arizona law the jury should be instructed its award will not be subject to federal income taxation.[11] To do otherwise would deny effect to the substantive federal interest for giving the instruction, *viz.*, preventing the jury from inflating its award.

The district court, however, concluded that Arizona had a substantive interest for denying the instruction. We disagree with the district court's analysis for two reasons. First, the district court predicated Arizona's substantive interest upon its belief that Arizona's measure of pecuniary damages in wrongful death cases was the decedent's gross, rather than net, income. Because Arizona actually measures damages by the decedent's income less his personal consumption expenses and taxes, the premise relied upon by the district court is incorrect.

We further differ with the district court for a more fundamental reason—assuming

---

**10.** Since the Arizona Superior Court in *Mitchell* relied primarily upon the Illinois Supreme Court's decision in *Hall*, it is not surprising that the two courts articulated virtually identical reasons for refusing the instruction.

**11.** We note that the First Circuit recently held that a district court did not err when it declined in a diversity case governed by New Hampshire law to instruct the jury that its award would not be taxed; however, the First Circuit reached this conclusion with-

out extended discussion and seems to have confused the issue as to whether evidence of the decedent's income taxes should be admitted with the question as to whether the jury should be instructed that damages for lost income are not subject to federal income taxation. *See Coy v. Simpson Marine Safety Equipment, Inc.*, 787 F.2d 19, 27 (1st Cir.1986). This decision does not persuade us to depart from our analysis in *In re Air Crash I*.

*arguendo* that Arizona measures the survivors' pecuniary damages by the decedent's gross income, that a state's measure of damages is gross, rather than net, income does not supply a substantive interest for refusing a nontaxability instruction. Whether the plaintiff's pecuniary damages for lost support should be reduced by the amount of the income taxes that the decedent would have paid, and whether the jury should be instructed that its award will not be taxed are distinctly different issues. That is to say, whether a jury calculates damages according to the decedent's gross or net income, there is a risk that the jury will inflate its award. Since the jury might inflate its award regardless of the state's measure of damages, that a state has adopted a "gross income" measure of damages does not constitute a substantive reason for refusing the instruction.

An example illustrates the point. Assume that a decedent would have earned $100,000 per year, would have spent $18,000 each year on personal consumption expenses, would have paid $15,000 annually in income taxes, and would have lived 10 more years before retiring. If a state measures damages according to the survivor's net pecuniary loss, then the plaintiff's pecuniary damages would be approximately $412,000, which is the present value at a 10% discount rate of $67,000 ($100,000 less $33,000 for personal expenses and taxes) per year for 10 years. A jury, mistakenly assuming that the plaintiff's pecuniary damages will be taxed at an average rate of 50%, might award the plaintiff $824,000 in the belief that she will receive $412,000 after paying taxes equal to half the award. To prevent the jury from inflating the award, a federal court sitting in diversity would instruct the jury that its award is not subject to federal income taxation, unless the state had a substantive reason for refusing the instruction.

If the state measures damages by the decedent's gross, rather than net income, then the plaintiff's pecuniary damages would be $504,000, that is, the present value of $82,000 a year for 10 years. There is the same risk that a jury, acting on its misconception that the plaintiff must pay taxes at an average rate of 50%, will inflate its award to $1,008,000. Since there is the same risk of overcompensating the plaintiff regardless of the state's measure of damages, a federal court would instruct the jury that its award will not be taxed. Merely that the state measures damages by the decedent's gross income thus does not lessen the need for a nontaxability instruction, and does not create a substantive interest on the part of the state for refusing the instruction. Indeed, because the size of the jury's verdict is greater when a state measures damages according to the decedent's gross income, the amount by which the jury is likely to inflate its verdict, and correspondingly, the need for giving a nontaxability instruction are greater than if the state measures damages by the survivors' net pecuniary loss.

D.   *Instructions and Counsel's Statements Concerning Liability*

■   At the start of the trial, the district court informed the jury that the plaintiff "charges that because of the condition of the DC–10 aircraft, the defendant, McDonnell Douglas Corporation, is liable to her and to her son, Michael Lux." Tr. 4. At the close of the trial, the district court instructed the jury that the plaintiff "claims that because of the condition of that DC–10 aircraft, the defendant, McDonnell Douglas Corporation, is liable to her and her son, Michael Lux." Tr. 548. MDC asserts, without citation to authority that, since MDC had admitted liability, the district court should not have informed the jury of the plaintiff's theory of liability. We disagree. The district court's instructions did not delve into the details of the plaintiff's theory of liability or suggest that MDC had agreed to the plaintiff's theory of recovery. Instead, they fairly and accurately informed the jury of the broad nature of the plaintiff's claim and of the fact that MDC had admitted liability. The court's statements, which simply told the jury why they were called upon to decide this case, were entirely proper.

MDC also alleges that the district court should have sustained the defendant's objections to certain statements made by the plaintiff's counsel in closing argument. The comments about which MDC complains include the following: "The nature of this lawsuit is what I would call a consumer protection type case," Tr. 473; "His [Michael Lux's] dad was killed because of their responsibility," Tr. 511; "We're here because of the responsibility of McDonnell Douglas in the manufacture of this aircraft," Tr. 533; and "She [Lora Lux] had Walter Lux, and they took him away." We note that MDC did not object to many of the statements about which it protests on appeal, and failed to present a standing objection to such statements. *See, e.g., United States v. Verrusio*, 803 F.2d 885, 893 (7th Cir.1986) (failure to seek continuing objection). Moreover, even if MDC had raised contemporaneous objections to plaintiff's arguments, "'improper comments during closing argument rarely rise to the level of reversible error.'" *Probus v. K-Mart, Inc.*, 794 F.2d 1207, 1210 (7th Cir. 1986) (quoting *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1311 (7th Cir. 1985)); *see also Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512, 526–27 (7th Cir.1983); *Lenard v. Argento*, 699 F.2d 874, 894 (7th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir.1982), *aff'd*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Nevertheless, there is no need to determine the propriety of these statements because there must be a new trial on damages. The parties' primary protection against prejudicial comments is the sound judgment of the district court, and we have faith that the district court, on remand, will guard against any improper argument.

### E. *Excessiveness of the Verdict*

Finally, MDC argues that the jury's verdict, even as reduced by remittitur, is excessive when compared to other awards under Arizona's wrongful death statute.

The judgment from which MDC appeals is for $3,000,000. By way of comparison, the highest reported verdict under Arizona's wrongful death statute appears to be for $2,000,000. *See Southern Pacific Transportation Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975). MDC asserts that, since the instant award is $1,000,000 greater than the verdict in *Lueck*, the judgment is excessive. We, however, should not simply compare the total damages, but should distinguish between the pecuniary and nonpecuniary damages awarded in the two cases. According to the testimony of the plaintiff's expert witness, roughly $1,590,000 of her award represents pecuniary damages; thus, the remainder, approximately $1,410,-000, constitutes nonpecuniary damages. In *Lueck*, the $2,000,000 award consisted of approximately $280,000 in pecuniary damages and about $1,720,000 in nonpecuniary damages. *See* 111 Ariz. at 571, 535 P.2d at 610.

With respect to pecuniary damages, Captain Lux was an airline pilot, who at the time of his death in 1979 was earning approximately $79,000 plus fringe benefits per year, while the decedent in *Lueck* was a journeyman concrete worker, who in the 5 years preceding his death in 1966 had a taxable income in his best year of less than $6,000. Given the difference between the decedents' earning capacities, the change in economic conditions between 1966 and 1979, and the detailed evidence of Captain Lux's expected earnings, an award of $1,600,000 in lost support does not seem excessive.

As for nonpecuniary damages, the plaintiff in this case received roughly $1,410,000, whereas the plaintiff in the *Lueck* case was awarded approximately $1,720,000. In light of the detailed evidence of the plaintiff's distress at her husband's death, an award of $1,410,000 for loss of companionship and pain and suffering, which actually is *less* than the nonpecuniary damages awarded in *Lueck*, does not appear excessive. *Cf. Reben v. Ely*, 146 Ariz. 309, 310, 705 P.2d 1360, 1360–61 (Ct.App.1985) ($1,000,000 award for loss of

**318**

consortium to parents of severely brain-damaged son).[12] Nonetheless, since there must be a new trial, we find it unnecessary to decide whether damages of $3,000,000 are excessive and we offer these comments only to guide the district court on remand.

See also, D.C., 602 F.Supp. 1458.

### III

For the reasons stated above, the judgment below is REVERSED and REMANDED for further proceedings consistent with this opinion.

12. We observe that "[a] district court sitting in diversity applies the federal standard for reviewing the size of a jury award." *See In re Innovative Construction Systems, Inc.,* 793 F.2d 875, 887 & n. 10 (7th Cir.1986). We have recognized that, in determining whether an award is excessive with reference to the federal standard, a federal court may consider whether the award is out of line compared to other awards in similar cases. *Id.* at 887 n. 11 (citing cases). In the case of a tort damages award in a routine diversity case, a federal court examining analogous awards is not necessarily limited to cases decided by the courts of the state whose law governs the diversity action. *See Huff v. White Motor Corp.,* 609 F.2d 286, 296 (7th Cir.1979) (Tone, J.) (considering size of awards in cases from other states).