In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1766

PATRICK HAHN AND ERIK REDWOOD,
Administrator of the Estate of Janet
Louise Hahn, Deceased,

*Plaintiffs-Appellants*,

*v.*

DANIEL WALSH, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:09-cv-02145-MPM-DGB — **Michael P. McCuskey**, *District Judge.*

ARGUED APRIL 15, 2014 — DECIDED AUGUST 12, 2014

Before RIPPLE and WILLIAMS, *Circuit Judges*, and ST. EVE, *District Judge.**

* The Honorable Amy J. St. Eve, of the United States District Court for the Northern District of Illinois, sitting by designation.

RIPPLE, *Circuit Judge.* Janet Hahn was a pretrial detainee at the Champaign County Correctional Center ("CCCC") immediately before she died as a result of diabetic ketoacidosis.[1] Patrick Hahn, Mrs. Hahn's husband, and Erik Redwood, the administrator of her estate, brought this action, alleging that various government officials and private contractors failed to provide adequate medical treatment, in violation of Mrs. Hahn's rights under the Fourteenth Amendment, the Americans with Disabilities Act, the Rehabilitation Act and Illinois state law. The district court dismissed some of the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) and granted summary judgment in favor of the defendants on the remaining claims.

The plaintiffs now appeal, raising three issues. First, the plaintiffs submit that the district court erred in dismissing their state law wrongful death claim. The district court faulted the plaintiffs for failing to comply with an Illinois statute that requires plaintiffs who allege medical malpractice to submit

---

[1] Diabetic ketoacidosis is a serious complication of diabetes. Individuals with Type-1 diabetes, like Mrs. Hahn, have little or no insulin in their bodies. *Diabetes*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/diabetes/basics/definition/con-20033091 (last visited July 31, 2014). Insulin transports glucose to cells for use as energy; the absence of insulin leads to a buildup of glucose in the bloodstream. *Id*. Many diabetics modulate this buildup by administering injections of insulin. *Id*. Diabetic ketoacidosis occurs when an individual's body does not break down this glucose; rather, the body begins to break down fat for fuel. *Diabetic Ketoacidosis*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/basics/definition/con-20026470 (last visited July 31, 2014). This situation causes "a buildup of toxic acids in the bloodstream," which can, as in this instance, be fatal. *Id.*

with their complaints (1) an affidavit confirming that a medical professional has verified the claim's merit and (2) a written report from that medical professional. Second, the plaintiffs contend that the district court abused its discretion by dismissing their wrongful death claim with prejudice instead of granting them leave to amend in order to cure the deficiency. Finally, they submit that the district court erred in granting summary judgment to two of the defendants.

We affirm in part and reverse in part the judgment of the district court. The district court correctly dismissed the plaintiffs' wrongful death claim but erred by dismissing it with prejudice. The plaintiffs produced insufficient evidence to permit their claims against Sheriff Walsh and Health Professionals Ltd. ("HPL"), the jail's medical services contractor, to survive summary judgment. Accordingly, we reverse the district court's judgment insofar as it dismissed the wrongful death claim with prejudice. We affirm the remainder of its decisions.

# I

## BACKGROUND

### A.

We recount the facts in the light most favorable to the plaintiffs. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013).

On the evening of June 15, 2007, Mrs. Hahn was arrested for aggravated domestic battery and transported to the satellite location of the CCCC. The Champaign County Sheriff's Office,

headed by Sheriff Daniel Walsh, operates the CCCC. Upon her arrival, Officer Chad Schweighart processed Mrs. Hahn into the CCCC as a detainee.[2] She was angry and uncooperative during booking. Mrs. Hahn told Officer Schweighart that she was diabetic and suicidal, but she refused to provide any additional information, such as the type of insulin she had been prescribed. She also refused to sign a release so that the CCCC could obtain her medical records. Officer Schweighart reported this information to his supervisor.

Mrs. Hahn was placed on suicide watch pursuant to a CCCC policy for handling detainees who are identified as mentally ill, who demonstrate unusual behavior or who indicate that they are experiencing suicidal ideations. Accordingly, Mrs. Hahn was given a gown and blanket made from a material that prevents detainees from fashioning them into instruments of self-harm. Further, correctional officers were required to observe Mrs. Hahn every fifteen minutes for signs of physical or mental distress and to report any such signs to their supervisors.

Beyond the fifteen-minute checks, the CCCC had additional policies in place relevant to Mrs. Hahn's physical and mental conditions. First, the CCCC contracted with a private company, HPL, to provide medical and mental health services to detainees in its custody.[3] All medical issues were referred to HPL's

---

[2]  This was not Mrs. Hahn's first detention at the CCCC. In May 2007, she also had been arrested and detained there.

[3]  It appears that the CCCC houses both pretrial detainees and sentenced

(continued...)

medical staff and mental health issues were referred to its counselors. CCCC officers deferred to the judgment of HPL professionals on issues of medical and mental health. Second, the CCCC had a policy of not forcing medical care on a resisting detainee. For example, if a diabetic detainee refused to have her blood sugar checked or to take insulin, CCCC officers were not supposed to force care on the detainee; the officers should have reported the refusal to a supervisor or to both a supervisor and medical staff. The CCCC also would not force patients to eat if they refused to do so. If a detainee refused a meal, the correctional officer on duty should have notified a supervisor; if the detainee refused more than one meal, it was "normal practice" for the correctional officer to notify both a supervisor and medical staff.[4] Medical or mental health staff then decided what to do about a detainee who refused to eat. Finally, if a detainee was suffering from an "obvious/life-threatening acute/emergency situation," CCCC officers were to call for emergency medical assistance.[5]

In order to provide the necessary medical and mental health care, HPL staffed the CCCC with a physician (who visited once per week), registered nurses and mental health personnel. Correctional officers could contact an on-call nurse at any time. HPL provided training on an annual basis to

---

[3] (...continued)
inmates. For simplicity's sake, we use the word "detainee" generically, to refer to all individuals housed in the CCCC.

[4] R.165 at 9.

[5] *Id.* (internal quotation marks omitted).

correctional officers about the care and monitoring of diabetic patients. This training included instruction on how to recognize hypoglycemia and hyperglycemia (low and high blood sugar, respectively).

In addition to the CCCC's policies and practices, HPL had its own policies for identifying and handling detainees suffering from serious medical conditions, including mental illness and diabetes. For diabetic detainees whose treatment protocol was unknown, HPL's policy called for blood sugar to be checked twice each day using an Accu-Chek glucose meter, for insulin to be delivered based on a particular dosage scale[6] and for an evening snack to be provided to the detainee. Insulin could be administered by a nurse, without consulting a physician. If a diabetic detainee refused treatment, medical staff would attempt to have the detainee sign a refusal-of-care form. HPL did not have a specific policy for checking the blood sugar of diabetic inmates who refused to use the Accu-Chek machine.

When Mrs. Hahn was first processed into the jail, Officer Joanne Lewis and a supervisor, Sergeant Michael Johnson, were among the officers on duty. Officer Lewis gave Mrs. Hahn a meal on the evening of June 15, 2007. When she returned to retrieve the tray, Officer Lewis noted that some of

---

[6] At the time of Mrs. Hahn's death, HPL had in place a "sliding scale" policy that called for the administration of a particular amount of insulin based on the individual's blood sugar reading. *See* R.133-7 at 36, 46–47, 166. For example, if an individual's blood sugar reading was higher than 201 but lower than 250, he received five units of regular insulin. If it was higher than 251 but lower than 300, he received eight units of regular insulin.

the food was gone, but she did not know whether Mrs. Hahn had eaten it. At some point that evening, Mrs. Hahn took off her gown and stuffed her gown and blanket into the toilet in her cell. The cell then flooded. Accordingly, the water to Mrs. Hahn's cell was shut off. After the water was shut off, correctional officers brought Mrs. Hahn water upon request. Officer Lewis assisted Mrs. Hahn in putting on a new gown.

Sergeant Johnson also interacted with Mrs. Hahn that evening. He spoke with Mrs. Hahn about her diabetes and discussed checking her blood sugar. Mrs. Hahn initially resisted but eventually agreed to have her blood sugar checked. After contacting the on-call HPL nurse, Kendra Adams, Sergeant Johnson checked Mrs. Hahn's blood sugar and, at 9:40 p.m., her blood sugar reading was 160. Adams advised Sergeant Johnson that this reading was within an acceptable range, and no insulin was provided to Mrs. Hahn.[7] The reading was recorded on a form called the "Blood Sugar and Insulin Tracking Sheet."

After his interaction with Mrs. Hahn, Sergeant Johnson wrote an e-mail to HPL staff. He stated that Mrs. Hahn was a "psych patient," that she had a cut and stitches on her left arm (and that the bandage had been removed for safety purposes because she had made statements about hurting herself), that she was unpredictable and had flooded her cell, and that her blood sugar was 160 and she was not given insulin.

---

[7] The district court noted, however, that a normal blood sugar reading was 80–120. The plaintiffs' expert testified that a reading of 160 is "above what you'd like in an insulin dependent diabetic, but it is not life-threatening." R.165 at 11 n.4.

Sergeant Johnson also left a message for officers assigned to subsequent shifts. That message included most of the information given to HPL, as well as a note that Mrs. Hahn had been very uncooperative and that the water in her cell had been turned off. CCCC staff started a "segregation log" for Mrs. Hahn, which noted various information, including her refusal of meals.

On that same evening, according to the testimony of Donald MacFarlane, a detainee at the CCCC, Mrs. Hahn stood at her cell window for more than an hour, yelling that she needed help and asking that her doctor be called. MacFarlane testified that this episode began after about 9:00 p.m.

Officer Karee Voges was on duty from 11:45 p.m. on June 15, 2007, to 8:15 a.m. on June 16, 2007. She testified that because she had interacted with Mrs. Hahn during her prior detention, she knew that Mrs. Hahn was a Type-1 diabetic and that she had a history of being angry and uncooperative. Officer Voges said that throughout that night, she brought Mrs. Hahn cups of water when requested. She offered breakfast to Mrs. Hahn around 6:30 a.m., but she documented on the log that Mrs. Hahn refused the meal.

On the morning of June 16, Mrs. Hahn was seen by both Alyson Morris, a mental health clinician with HPL,[8] and by

---

[8]   Morris had a master's degree in counseling and received additional training from HPL, which covered suicide prevention and, in particular, suicide prevention in a correctional environment.

Susan Swain, a nurse with HPL.[9] Morris's interaction with
Mrs. Hahn was brief; at its conclusion, she wrote an e-mail to
Sergeant Johnson, on which she copied her supervisor. Morris
wrote that Mrs. Hahn was still uncooperative and angry.

Swain arrived at the CCCC around 9:30 a.m. on June 16.
She reviewed Officer Schweighart's paperwork regarding
Mrs. Hahn. Swain recalled from a prior experience with
Mrs. Hahn and from looking at Mrs. Hahn's records that
Mrs. Hahn was an insulin-dependent diabetic and that she
previously had refused insulin and blood sugar checks. She
also was aware of the possibility that Mrs. Hahn suffered from
a mental disability. Swain was called to Mrs. Hahn's cell at

---

[9] While Mrs. Hahn was detained at the CCCC in May 2007, she had been
treated by Swain. At that time, Swain sent an e-mail to an account called
"Corrections" regarding her difficulties with Mrs. Hahn. The e-mail read:

> Hi there! This young lady is quite a challenge to work
> with. She refuses to disclose any of her medical history or
> conditions except for the fact that she is insulin dependant
> [sic] diabetic. She also refuses to sign any release of
> information and told me that she will not tell me who her
> doctor is or where she seeks treatment at. She will be
> leaving tomorrow (05-07-07) and she states that she will
> not eat while she is here. She has pretty much tied my
> hands as far as helping her goes. Please bring her to the
> infirmary to test her blood sugar tonight and tomorrow
> morning BUT I am not at all sure that she will cooperate
> with the test. She can give herself insulin per sliding scale
> however I am pretty sure that she will not do that either!
> Thanks for your assistance in this matter!!!!

*Id.* at 3–4.

around 10:00 a.m. because a correctional officer had tested Mrs. Hahn's blood sugar and found it to be 396.[10] The reading was documented on the tracking sheet. When Swain arrived at Mrs. Hahn's cell, she attempted to take vital signs and get a medical history, but Mrs. Hahn resisted providing information. Mrs. Hahn also refused to sign a release that would allow Swain to obtain her medical information from her usual physician. Swain testified that, at this point in time, Mrs. Hahn was "oriented to time and place" and did not complain of feeling poorly.[11] Mrs. Hahn refused to go to the infirmary with Swain. Instead, Swain brought twenty units of insulin to Mrs. Hahn and administered it in her cell.[12] This was recorded on the tracking sheet. Swain placed Mrs. Hahn on the diabetes treatment protocol described above. Later that morning, Mrs. Hahn was taken to bond court.

On the afternoon of June 16, Morris conducted a more in-depth assessment of Mrs. Hahn. She completed an "Initial Mental Health Screening and Assessment Form," which noted

---

[10]  The plaintiffs cite testimonial evidence that a reading of 396 was "extremely high" and that a doctor should have been contacted at this point. Appellants' Br. 8 n.13 (internal quotation marks omitted).

[11]  R.165 at 14; *see also* R.133-7 at 45–46.

[12]  Swain testified that according to HPL's scale, an individual with a blood sugar reading of 396 is to be given fifteen units of insulin. However, she also testified that a doctor had advised her that when the reading is close to a limit on the scale, she should administer the dosage of insulin corresponding with the next increment on the scale. Therefore, she administered twenty units of insulin to Mrs. Hahn.

Mrs. Hahn's antidepressant medication[13] and primary mental health clinician. She e-mailed CCCC staff, stating that Mrs. Hahn was "mentally retarded and a poor historian," and that she should remain on suicide watch for at least seventy-two hours.[14] She stated that mental health staff would reevaluate Mrs. Hahn's condition in twenty-four to forty-eight hours. Morris also told Swain that Mrs. Hahn was uncooperative and that she was trying to convince Mrs. Hahn about the importance of working with the medical staff to treat her diabetes.

Around 4:00 p.m. on June 16, Mrs. Hahn was escorted to the infirmary by Officer Jenna Thode for a blood sugar check. Officer Thode initially wrote down 320 on the tracking sheet as Mrs. Hahn's blood sugar level. She then crossed it out and wrote 107. Officer Thode's explanation is that 320 is her badge number, and she had written it accidentally. Mrs. Hahn refused dinner on the evening of June 16. MacFarlane testified that Mrs. Hahn looked sick and pale that evening.

Officer Voges worked overnight again from June 16 to June 17. She brought Mrs. Hahn water on several occasions. In the morning on June 17, Mrs. Hahn refused breakfast. Officer Voges tried to test Mrs. Hahn's blood sugar. The Accu-Chek machine read "E" on two attempts. An "E" reading could

---

[13] Morris noted that Mrs. Hahn had been prescribed Seroquel. Seroquel is prescribed "as an antipsychotic in the treatment of schizophrenia and other psychotic disorders," Dorland's Illustrated Medical Dictionary 1566, 1698 (32d ed. 2012), but Morris believed that Mrs. Hahn took Seroquel primarily as a sleep aid.

[14] R.165 at 14 (internal quotation marks omitted).

indicate that there was not enough blood used or that the stick containing blood was not inserted properly into the Accu-Chek machine. According to the plaintiffs, it also could mean that there was "some problem with the machine."[15] These error readings were not recorded on the tracking sheet. Around 9:00 a.m., Mrs. Hahn asked a different officer to have her blood sugar checked. When Swain arrived at the CCCC, that officer told her that Mrs. Hahn had not eaten breakfast and that attempts to check her blood sugar were unsuccessful. Swain checked on Mrs. Hahn and, at this point, Mrs. Hahn refused to allow staff to try to use the Accu-Chek machine again. Swain told Mrs. Hahn that the failure to check her blood sugar could compromise her health, but there is no evidence as to whether anyone asked Mrs. Hahn to sign a refusal-of-treatment form.

At approximately 11:00 a.m. that same morning, a correctional officer told Swain that Mrs. Hahn had reported vomiting in her cell. Swain immediately went to check on Mrs. Hahn, but she did not observe any signs of vomiting. Swain said that she spoke with Mrs. Hahn at this point and observed her for any signs or symptoms of illness. Throughout the day on June 17, Officer Terrance Alexander had repeated contacts with Mrs. Hahn. He did not observe any signs of medical or mental distress. He asked Mrs. Hahn multiple times if she would have her blood sugar tested, and she refused. Mrs. Hahn refused lunch that afternoon. At 3:00 p.m., Swain returned to Mrs. Hahn's cell. Swain testified that she did not observe any signs of diabetic ketoacidosis and that Mrs. Hahn spoke to her

---

[15] Appellants' Br. 10.

coherently. She also testified that she offered to test Mrs. Hahn's blood sugar, but she refused.

Later that evening, Officer Thode tried to test Mrs. Hahn's blood sugar but Mrs. Hahn again refused. Mrs. Hahn also refused dinner that evening. Mrs. Hahn told Officer Thode that she had been throwing up for the last few days. Officer Thode told the officers whose shift followed hers about her interactions with Mrs. Hahn, but Mrs. Hahn's refusals to have her blood sugar checked were not documented on the tracking sheet or segregation log.

Sixty-one cell checks, conducted by multiple correctional officers, were performed from 3:00 p.m. on June 17 to 6:30 a.m. on June 18. One officer testified that when he checked on Mrs. Hahn throughout his overnight shift, she was making sounds and moving around a lot and that he heard her hitting the door. Another officer, Matthew McCallister, testified that sometime between 2:00 a.m. and 4:00 a.m., he opened the door to Mrs. Hahn's cell to check on her because she was so close to the door that he could not see her from the outside, but that she was responsive and moved away from the door when he opened it. Two detainees testified that, during the night, they heard a female detainee stating that she did not feel well, that she wanted to see the nurse and that she needed insulin.

Early in the morning on June 18, CCCC staff began to treat Mrs. Hahn's condition as acute. MacFarlane testified that, around 6:00 a.m., a correctional officer looked into Mrs. Hahn's

cell and said, "This one's not looking so good."[16] Approximately twenty-five minutes later, Officer Arnold Mathews observed Mrs. Hahn and found her to be in medical distress. He called for medical assistance, and emergency medical services were contacted. Mrs. Hahn was taken to the hospital, where tests showed that Mrs. Hahn had a blood sugar reading of 966, a blood urea nitrogen reading of 62, a creatinine reading of 3–4 and swelling in the brain as a result of diabetic ketoacidosis. The plaintiffs' expert testified that this data indicated that Mrs. Hahn had been suffering from diabetic ketoacidosis for hours. Mrs. Hahn died in the hospital later that day.

## B.

In June 2009, Mr. Hahn and Mr. Redwood filed an eight-count complaint in the United States District Court for the Central District of Illinois. The Amended Complaint, filed shortly after the original complaint, named as defendants the County of Champaign, Sheriff Walsh, Officer McCallister and other unnamed Champaign County correctional officers. It also named HPL and unnamed "jail nurse(s)."[17] Lastly, it named the City of Urbana and the Urbana police officers who had arrested Mrs. Hahn on June 15. Only some of the counts in the

---

[16] R.165 at 18 (internal quotation marks omitted).

[17] R.3 at 1.

Amended Complaint are relevant here.[18] Count II of the

---

[18] Count I and some of the other counts in the Amended Complaint relate to defendants or claims that are not part of this appeal. Count I of the Amended Complaint alleged that the individual defendants exhibited deliberate indifference to Mrs. Hahn's serious medical needs, in violation of her Fourteenth Amendment rights, when they refused to take her to a hospital or provide necessary medical or psychiatric care. Count I was terminated as to all of the CCCC defendants except for Sheriff Walsh because those defendants were never served. The police officers were granted summary judgment on Count I. Sheriff Walsh also was granted summary judgment on Count I because the plaintiffs could not produce any evidence establishing his personal knowledge of or involvement in Mrs. Hahn's treatment. The plaintiffs do not appeal this portion of the district court's summary judgment ruling.

Count III alleged that the City of Urbana exhibited deliberate indifference by failing to implement adequate policies and procedures for handling arrestees with serious medical and mental health conditions. The district court granted summary judgment to the City on this count, and the plaintiffs do not appeal this part of the district court's decision.

Count VI alleged that Champaign County and HPL violated the Americans with Disabilities Act and the Rehabilitation Act by failing to accommodate Mrs. Hahn's mental health and medical conditions and by denying her adequate treatment. The district court granted summary judgment to the defendants on this count. The plaintiffs do not appeal this determination.

Count VII alleged a claim against all of the defendants by Mr. Hahn for loss of consortium. The district court dismissed this count, holding that loss of consortium was not a separate cause of action. It ordered that the plaintiffs be given leave to amend their complaint to include with their constitutional claims a demand for damages for loss of consortium. The plaintiffs therefore filed a Second Amended Complaint that incorporated

(continued...)

Amended Complaint alleged that Sheriff Walsh had exhibited deliberate indifference to Mrs. Hahn's medical needs by failing to implement policies and procedures necessary to prevent deaths as a result of inadequate medical and mental health treatment. Count IV alleged that HPL had exhibited deliberate indifference by failing to implement adequate policies and procedures for providing detainees with medical and mental health care. Count V alleged that Sheriff Walsh's failure to train and supervise jail employees constituted deliberate indifference because it had created an atmosphere where "unconstitutional behavior [wa]s ratified, tolerated, acquiesced or condoned."[19] Finally, Count VIII alleged that HPL and its nurses had violated Illinois's Wrongful Death Act, 740 ILCS 180/1 to /2.2. The plaintiffs requested compensatory and punitive damages, attorney's fees and litigation expenses.

The defendants moved to dismiss the complaint on various grounds. Relevant to this appeal, the County of Champaign, Sheriff Walsh and HPL moved to dismiss Count VIII, the state law wrongful death action. Specifically, the defendants contended that the plaintiffs had failed to comply with an Illinois state law, 735 ILCS 5/2-622, that required them to include with their complaint "an affidavit of merit and a

---

[18] (...continued)

the loss of consortium claims into each of the other, remaining counts. The plaintiffs make no arguments on appeal about the loss of consortium claim.

[19] R.3 at 7.

written report from a health professional."[20] The magistrate judge recommended dismissing this count for failure to include the required affidavit and report.[21] Notably, he further wrote that he took "no position as to whether the dismissal should be with or without prejudice, leaving that [decision] to the discretion of the District Court."[22] The district court dismissed Count VIII for failure to include the affidavit and report and ordered that the dismissal be with prejudice because the

---

[20] R.17 at 5.

[21] In reaching this conclusion, the magistrate judge rejected the plaintiffs' contention that they had satisfied the requirements of section 2-622 by including in their complaint a paragraph stating:

> 50. Plaintiff has been unable to secure the affidavit of a medical professional in support of the Complaint because Defendant Daniel Walsh failed and refused to respond to a duly served Freedom of Information Act Request for all records, including jail medical records, concerning Janet Louise Hahn and plaintiff does not have independent access to these medical records which are necessary for the review of a medical professional and the affidavit required.

R.3 at 11. The magistrate judge wrote that even where records cannot be obtained and, therefore, a report cannot be prepared by a medical professional, section 2-622 requires the plaintiffs' attorney to submit an affidavit containing certain information about the attempt to obtain the necessary records. R.34 at 16. An allegation in the complaint, the magistrate judge recommended, could not be substituted for the required affidavit. *Id.*

[22] R.34 at 17.

"[p]laintiffs clearly failed to comply with the requirements of § 2-622 and the statute of limitations has passed."[23]

The plaintiffs then filed a Second Amended Complaint that addressed the rulings made by the district court on the motions to dismiss. Counts II, IV and V remained substantially unchanged in the Second Amended Complaint. The plaintiffs did not include a wrongful death claim in the Second Amended Complaint. They did, however, file a motion under Federal Rule of Civil Procedure 59(e) to amend the judgment dismissing Count VIII. They made two arguments: (1) that no affidavit or report needed to be provided because Federal Rule of Civil Procedure 8, not Illinois state pleading rules, governed the sufficiency of their complaint; and (2) that, in the alternative, they should have been permitted to amend their complaint under the relation-back doctrine, despite the expiration of the relevant limitations period. The district court denied the Rule 59(e) motion; it held that section 2-622 applies in federal court and that dismissal with prejudice was proper because plaintiffs' counsel knew of the affidavit requirement and failed to attempt to comply with it before the statute of limitations had expired.

The case proceeded through discovery, and, in February 2012, the defendants moved for summary judgment. The district court granted summary judgment in favor of the defendants. With respect to the claims against Sheriff Walsh in his official capacity (Counts II and V), the district court held that the plaintiffs had "not identified evidence sufficient for the

---

[23] R.40 at 1–2.

factfinder to conclude that Walsh maintained a policy or custom evincing deliberate indifference to the needs of mentally ill or diabetic inmates that resulted in harm to Janet."[24] With respect to the claims against HPL, the district court held that, "based upon the evidence in this case, the medical protocol Janet was prescribed was not the moving force behind any constitutional violation."[25]

## II

## DISCUSSION

The plaintiffs timely appealed and now challenge three of the district court's rulings. First, they submit that the district court erred in dismissing the state law wrongful death claim (Count VIII). Specifically, they contend that Illinois's statutory requirement that a claim alleging medical malpractice—as the wrongful death claim against HPL does—be accompanied by an affidavit and written report confirming the claim's merit, *see* 735 ILCS 5/2-622, conflicts with Rule 8 or Rule 11 of the Federal Rules of Civil Procedure and, therefore, should not be enforced in federal court under the *Erie* doctrine. Second, they argue that the district court's dismissal with prejudice of the wrongful death claim constituted an abuse of discretion. Finally, they submit that the district court improperly granted summary judgment to Sheriff Walsh and HPL on the § 1983 claims.

---

[24] R.165 at 42–43.

[25] *Id.* at 54.

The jurisdiction of this court and of the district court is secure.[26] We review de novo the district court's decision to grant the defendants' motion to dismiss the plaintiffs' wrongful death claim. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 667 (7th Cir. 2008). We review for abuse of discretion the district court's decision to dismiss that claim with prejudice. *See Sherrod v. Lingle*, 223 F.3d 605, 614 (7th Cir. 2000). Finally, we review de novo the district court's grant of summary judgment in favor of the defendants. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). In doing so, we construe all facts and draw all reasonable inferences in the light most favorable to the plaintiffs. *Id.*

## A.

We first turn to the dismissal of the defendants' wrongful death claim. Count VIII of the plaintiffs' Amended Complaint alleged that HPL had failed to provide adequate medical treatment to Mrs. Hahn, in violation of the state's Wrongful Death Act, 740 ILCS 180/1 to /2.2. Under Illinois law, a plaintiff seeking damages for "medical, hospital, or other healing art malpractice" must attach to his complaint either (1) an affidavit confirming that he has reviewed the facts of the case with a health care professional and that the professional believes that there is a "reasonable and meritorious cause for the filing of such action," as well as a copy of the professional's written

---

[26]   We have jurisdiction under 28 U.S.C. § 1291. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343 and 1367.

report on the case, or (2) an affidavit stating an acceptable reason why such an opinion and report could not be obtained. 735 ILCS 5/2-622(a).[27] The statute goes on to state that "[t]he

---

[27] Section 2-622 reads, in pertinent part:

> (a) In any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice, the plaintiff's attorney … shall file an affidavit, attached to the original and all copies of the complaint, declaring one of the following:
>
>> 1. That the affiant has consulted and reviewed the facts of the case with a health professional … ; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such action. … A copy of the written report, clearly identifying the plaintiff and the reasons for the reviewing health professional's determination that a reasonable and meritorious cause for the filing of the action exists, must be attached to the affidavit … .

(continued...)

failure to file a certificate required by this Section shall be
grounds for dismissal." *Id.* § 5/2-622(g).

The parties do not dispute that if this claim had been
brought in state court, this provision would have required the
plaintiffs to file an affidavit and report conforming to the
statutory requirements. They disagree solely as to whether the
affidavit and report must be attached when the state law claim
is brought in federal court. The district court held that they
must comply with the provisions of state law.

---

[27] (...continued)

> 2. That the affiant was unable to obtain a
> consultation required by paragraph 1
> because a statute of limitations would
> impair the action and the consultation
> required could not be obtained before the
> expiration of the statute of limitations. …
>
> 3. That a request has been made by the
> plaintiff or his attorney for examination
> and copying of records pursuant to Part
> 20 of Article VIII of this Code and the
> party required to comply under those
> Sections has failed to produce such re-
> cords within 60 days of the receipt of the
> request.

735 ILCS 5/2-622(a). Thus, the statute requires the filing of either an
affidavit and a report or, if those preferred items cannot be obtained, an
affidavit explaining the deficiency. Throughout this opinion, we frequently
refer to this provision as a requirement to submit an "affidavit and report,"
with the understanding that, occasionally, only an affidavit is necessary.

The plaintiffs now seek a reversal of that ruling. They submit that section 2-622 is a state procedural rule that conflicts with either Rule 8 or Rule 11 of the Federal Rules of Civil Procedure.[28] Therefore, in their view, section 2-622 does not apply in federal court under the terms of the *Erie* doctrine. The defendants reply that section 2-622 is state substantive law that must be applied in federal court.

The district court was correct. The basic doctrine governing this area stems from *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). There, the Supreme Court addressed the question of whether state law or federal law controls when the two conflict in diversity cases.[29] Stated in the broadest of strokes, the *Erie* doctrine provides that "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). But analysis of particular applications of this broad doctrine is more nuanced than simply labeling a state law "substantive" or "procedural." *See Lux v. McDonnell Douglas Corp. (In re Air Crash Disaster)*, 803

---

[28] The plaintiffs did not argue to the district court that section 2-622 conflicts with Federal Rule of Civil Procedure 11. Thus, the issue was waived. *See, e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal."). Nevertheless, we address the possible conflict with Rule 11 because the defendants did not argue that the issue was waived, thereby waiving the waiver argument. *See, e.g.*, *Riemer v. Illinois Dep't of Transp.*, 148 F.3d 800, 804 n.4 (7th Cir. 1998).

[29] This body of law applies not only to diversity cases, but also where, as here, federal courts hear state law claims pursuant to their exercise of supplemental jurisdiction. *See Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002).

F.2d 304, 313 (7th Cir. 1986) (observing that the *Erie* doctrine is not a "monolithic legal principle" that is applied the same way in all situations (internal quotation marks omitted)).

In this case, the analytical path set out in the Supreme Court's later decision in *Hanna v. Plumer*, 380 U.S. 460 (1965), provides us with more precise guidance. There, the Court addressed specifically how we ought to proceed when a state law is alleged to conflict with a Federal Rule of Civil Procedure. *See Windy City*, 536 F.3d at 670–71. Under *Hanna*, "if a duly promulgated federal rule of procedure conflicts with state law, the Rules Enabling Act, 28 U.S.C. § 2072, commands a federal court to apply [the federal] rule of procedure unless to do so would abridge a substantive right under state law." *In re Air Crash Disaster*, 803 F.2d at 313–14 (footnote omitted). In applying *Hanna*, we first consider whether there is a conflict between 735 ILCS 5/2-622 and either Rule 8 or Rule 11, or whether the state and federal laws may be reconciled. *Windy City*, 536 F.3d at 671 (citing *Burlington N. R.R. Co. v . Woods*, 480 U.S. 1 (1987) and *Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980)). If there is no conflict, then our inquiry ends because there is no need to displace any rule.

In this case, we conclude that there is no conflict between section 2-622 and either Rule 8 or Rule 11 and, therefore, we only need to conduct the first step of the *Hanna* analysis. *See Shady Grove*, 559 U.S. at 398 ("We do not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid."). The Supreme Court has held in a number of instances that a Federal Rule controlled in the face of a conflicting state

law,[30] but the case before us is more similar to *Walker*, 446 U.S.

---

[30] For example, in *Hanna v. Plumer*, 380 U.S. 460, 461 (1965), the plaintiff served a defendant by leaving a summons and complaint at the defendant's home with his wife, in compliance with Federal Rule of Civil Procedure 4(d)(1). The defendant contended that service was improper under a Massachusetts law requiring in-hand service. *Id.* at 461–62. The Court held that Rule 4(d)(1) "with unmistakable clarity [said] that in-hand service is not required in federal courts." *Id.* at 470. Therefore, Rule 4(d)(1) "unavoidabl[y]" conflicted with the Massachusetts rule. *Id.* In the face of this conflict, the Court concluded that because Rule 4(d)(1) was valid under the Rules Enabling Act and the Constitution, it controlled in that case. *Id.* at 463–64, 474.

In *Burlington Northern Railroad Co. v. Woods*, 480 U.S. 1, 2 (1987), the plaintiffs brought tort claims in Alabama state court against a defendant who removed those claims to federal court on diversity grounds. The plaintiffs won a monetary judgment at trial. *Id.* The defendant posted bond to stay the judgment pending appeal, and the court of appeals affirmed the judgment. *Id.* Under Federal Rule of Appellate Procedure 38, federal appellate courts have discretion to award damages or costs to appellees in frivolous appeals. Alabama law, however, mandates that if a monetary judgment for which the appellant posted bond pending appeal is affirmed without modification, the Alabama courts must award a penalty to the appellee in the amount of ten percent of the damages award. *Burlington N.*, 480 U.S. at 3–4. The Supreme Court held that Rule 38 and Alabama law directly conflicted because the Alabama law interfered with Rule 38's "discretionary mode of operation" and because "the purposes underlying the Rule are sufficiently coextensive with the asserted purposes of the Alabama statute to indicate that the Rule occupies the statute's field of operation so as to preclude its application in federal diversity actions." *Id.* at 7. Thus, because there was a conflict and because Rule 38 was valid under the Constitution and the Rules Enabling Act, Rule 38 displaced the Alabama statute in federal diversity cases. *Id.* at 8.

(continued...)

740, where the Court held that there was no conflict between the relevant federal and state rules. In *Walker*, the plaintiff was injured while hammering an allegedly defective nail on August 22, 1975. *Id.* at 741. He filed a diversity suit against the nail's manufacturer on August 19, 1977. *Id.* at 742. However, the plaintiff did not serve the defendant with process until December 1, 1977. *Id.* Under Federal Rule of Civil Procedure 3, "[a] civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3; *see also Walker*, 446 U.S. at 743. Under Oklahoma state law, however, an action generally is commenced upon service. *Walker*, 446 U.S. at 742–43. The applicable statute of limitations was two years, so the plaintiff's suit was timely under Rule 3 but barred under Oklahoma law. *Id.* at 742–43, 748. The Court held that, in diversity cases, Rule 3

---

[30] (...continued)

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 397 (2010), the plaintiff filed a diversity suit on its own behalf and on behalf of a class of plaintiffs who it alleged were owed interest on late benefits payments received from the defendant. Federal Rule of Civil Procedure 23 sets out the procedures for pursuing a class action in federal court; notably, there is no limitation based on the type of relief sought. *See* Fed. R. Civ. P. 23. New York law, by contrast, prohibits class action suits seeking to recover a "penalty," such as the statutory interest sought by the plaintiffs. *Shady Grove*, 559 U.S. at 397. The Court held that both Rule 23 and the New York law at issue governed when plaintiffs may maintain a class action and, therefore, there was a direct conflict between them. *Id.* at 398–99. A plurality of the Court held that Rule 23 was valid under the Rules Enabling Act, *id.* at 407–08 (opinion of Scalia, J.), and five Justices agreed that Rule 23, not the New York law at issue, should be applied in federal court. *Id.* at 416; *id.* at 416 (Stevens, J., concurring in part and concurring in the judgment).

does not displace state tolling rules; rather, it simply "governs the date from which various timing requirements of the Federal Rules begin to run." *Id.* at 750–51 (internal quotation marks omitted). Thus, the Court concluded that Rule 3 and the Oklahoma law "can exist side by side, … each controlling its own intended sphere of coverage without conflict." *Id.* at 752.

As with the rules in *Walker*, Rules 8 and 11 and section 2-622 comfortably "can exist side by side" in diversity cases. Nothing in the operative provisions of Rule 8, Rule 11 or section 2-622 prevents us from simultaneously applying them. Rule 8 governs the content and form of a complaint. It requires, in pertinent part, that a complaint include a jurisdictional statement, a statement of the claim and a demand for relief.[31]

---

[31] Rule 8(a) provides:

A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

(continued...)

Section 2-622 says nothing about the contents of the actual complaint; it is only concerned with a pre-suit consultation and related attachments to the complaint. Illinois courts have held specifically that the affidavit and report required by section 2-622 are not to be considered parts of a plaintiff's complaint. *Garrison v. Choh*, 719 N.E.2d 237, 240, 243–44 (Ill. App. Ct. 1999). Rule 8 and section 2-622 govern different aspects of commencing an action and may be enforced simultaneously without conflict.

Rule 11 may be enforced consistently with section 2-622 as well. The relevant portion of Rule 11 provides:

> By presenting to the court a pleading, written motion, or other paper … an attorney … certifies that to the best of the person's knowledge, information, and belief, … :
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

---

[31] (…continued)
Fed. R. Civ. P. 8(a).

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery … .

Fed. R. Civ. P. 11(b)(1)–(3). Section 2-622's requirement that an attorney attach an affidavit and report to the complaint does not interfere with the ability of the attorney to certify the accuracy and legitimacy of that complaint. Accordingly, section 2-622 and Rule 11 may be applied simultaneously.

Further, given the respective purposes of Rule 8, Rule 11 and section 2-622, it cannot be said that one of the Federal Rules occupies the field that section 2-622 aims to regulate and, therefore, must trump the state law. *See Burlington N.*, 480 U.S. at 7. The purpose of section 2-622 is "to reduce the number of frivolous medical malpractice lawsuits that are filed and to eliminate such actions at an early stage." *Apa v. Rotman*, 680 N.E.2d 801, 804 (Ill. App. Ct. 1997).[32] It is designed to ensure that a complaint has "factual validity" and "reasonable merit." *Garrison*, 719 N.E.2d at 243 (internal quotation marks omitted).

By contrast, the purpose of Rule 8 is to provide a defendant with fair notice of the claims against him. *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775 (7th Cir. 1994); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Even after *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which clarified that a complaint must state a claim for relief that is

---

[32] *See also Avakian v. Chulengarian*, 766 N.E.2d 283, 294 (Ill. App. Ct. 2002); *Tucker v. St. James Hosp.*, 665 N.E.2d 392, 396 (Ill. App. Ct. 1996).

"plausible" on its face, we have emphasized that plausibility is required "in order to assure that a pleading suffices to give effective notice to the opposing party," not in order to evaluate the veracity of the pleaded facts or the ultimate merits of the plaintiff's claim. *Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013); *cf. Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (noting that a complaint need not show whether a plaintiff will ultimately prevail). Thus the purposes of Rule 8 (fair notice) and section 2-622 (eliminating frivolous claims) are different enough that the rules comfortably may coexist in diversity cases.

With respect to Rule 11, the Supreme Court has stated that its "central purpose … is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *Id.* (quoting Fed. R. Civ. P. 11 (1989)). Because Rule 11 is about attorney conduct—not about (or only incidentally about) the merits of a plaintiff's case—it has a sufficiently separate purpose from section 2-622 that no conflict exists between them.

Our prior cases support the conclusion that Rules 8 and 11 and section 2-622 may be enforced simultaneously in diversity

cases.[33] In *Hines v. Elkhart General Hospital*, 603 F.2d 646, 647 (7th Cir. 1979), we held that an Indiana law requiring a medical malpractice plaintiff to obtain the opinion of a medical review panel prior to initiating a court action did not conflict with any federal rules and should be enforced in federal courts sitting in diversity. Indeed, we have noted that, in diversity actions, application of state law is usually indicated where the state rule may seem procedural but "is limited to a particular substantive area." *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 60 F.3d 305, 310 (7th Cir. 1995) (collecting cases). Such a limitation, we have said, indicates a "state's intention to influence substantive outcomes." *Id.* Here, Illinois has limited section 2-622 to cases involving medical or other healing art malpractice. We therefore may infer that Illinois's "goals are substantive" and would be thwarted if parties having access to a federal court under diversity jurisdiction could thereby exempt themselves from the compulsory requirement. *See id.* Together, *Hines* and *Healy* require the result we reach today: that section 2-622 must be applied by federal courts sitting in diversity.

---

[33] This conclusion also is consistent with the few of our sister circuits that have addressed this precise issue. *See, e.g.*, *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 261–65 (3d Cir. 2011) (finding no conflict between Rule 8 or Rule 11 and a Pennsylvania statute requiring a "certificate of merit" to be filed in professional malpractice claims); *Chamberlain v. Giampapa*, 210 F.3d 154, 158–61 (3d Cir. 2000) (finding no conflict between Rule 8 or Rule 9 and a similar New Jersey law); *cf. Littlepaige v. United States*, 528 F. App'x 289, 292–93 (4th Cir. 2013) (holding that a North Carolina rule requiring an expert certification in a medical malpractice case applied in a Federal Tort Claims Act case sounding in medical malpractice brought in federal court).

In sum, section 2-622 may be applied in diversity cases without running afoul of either Rule 8 or Rule 11. Therefore, the district court properly dismissed the plaintiffs' wrongful death claim against HPL because the plaintiffs had failed to attach the required affidavit and report.

**B.**

Having determined that the district court properly granted the defendants' motion to dismiss the plaintiffs' state law wrongful death claim, we now examine the district court's decision to dismiss that claim with prejudice. In dismissing the claim initially, the district court wrote, "Plaintiffs clearly failed to comply with the requirements of § 2-622 and the statute of limitations has passed. Therefore, this court concludes that dismissal of Count VIII with prejudice is proper in this case."[34] In denying the plaintiffs' Rule 59(e) motion, the district court emphasized that plaintiffs' counsel was aware from a prior case before the same district court that the court enforced section 2-622.[35] The district court also distinguished between cases where plaintiffs had filed defective affidavits or reports (where dismissal without prejudice was appropriate) and cases where they had failed to file an affidavit and report altogether (where dismissal with prejudice was appropriate).

---

[34] R.40 at 2 (citation omitted).

[35] R.49 at 6 (citing *Winfrey v. Walsh*, No. 07-CV-2093, 2007 WL 4556701, at *1 (C.D. Ill. Dec. 21, 2007)).

We are mindful of the discretion accorded to district courts in deciding whether to grant a motion to dismiss with or without prejudice. We are especially cautious about interfering with that discretion here because the district court believed that counsel knew that the district court required compliance with section 2-622 and deliberately had failed to respect the court's prior holdings. Nevertheless, we think that several considerations require that the district court reconsider this issue.

First, our cases and Illinois cases suggest that when a claim is dismissed for failure to include a section 2-622 affidavit and report, the dismissal should be without prejudice. The Appellate Court of Illinois has held expressly that when a plaintiff raises a claim that implicates section 2-622 but fails to include an affidavit and report, the plaintiff should have the opportunity to amend her complaint before it is dismissed with prejudice:

> Section 2-622 is a pleading requirement designed to reduce frivolous lawsuits, not a substantive defense which may be employed to bar plaintiffs who fail to meet its terms. Accordingly, the statute should be liberally construed and not mechanically applied to deprive a plaintiff of her substantive rights. The plaintiff in a medical malpractice action should be allowed every reasonable opportunity to establish her case.
>
> The decision as to whether an action should be dismissed by reason of the plaintiff's failure to comply with the requirements of section 2-622 is a

matter committed to the discretion of the trial court. When, as in this case, a plaintiff fails to attach the requisite affidavit and health care professional's report to a complaint based on medical malpractice, *a sound exercise of discretion mandates that she be at least afforded an opportunity to amend her complaint to comply with section 2-622 before her action is dismissed with prejudice.*

*Cammon v. W. Suburban Hosp. Med. Ctr.*, 704 N.E.2d 731, 738–39 (Ill. App. Ct. 1998) (emphasis added) (citations omitted) (internal quotation marks omitted). We quoted *Cammon* and echoed its sentiment in *Sherrod v. Lingle*, 223 F.3d 605, 614 (7th Cir. 2000), where we held that a district court's failure to permit a plaintiff to amend his complaint in order to comply with section 2-622 was an abuse of discretion.[36]

Second, although the district court believed that plaintiffs' counsel should have known to submit an affidavit and report in accordance with section 2-622, it made no specific finding that the failure to do so was in bad faith or an attempt to delay

---

[36] The district court distinguished *Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000), from this case because, in *Sherrod*, the plaintiff had filed a defective affidavit and report and, in this case, the plaintiffs had failed to file an affidavit and report at all. We cannot accept this reading of *Sherrod*. We reasoned there that, under Illinois law, if a trial court is supposed to give a plaintiff leave to amend when she fails to file *any* affidavit and report, then certainly a trial court should grant a plaintiff leave to amend when she files a flawed affidavit and report. *See id.* at 614; *cf. Cookson v. Price*, 914 N.E.2d 229, 232 (Ill. App. Ct. 2009) (noting that there is no difference between amending an existing report and submitting a new report in lieu of an old one).

litigation. *See Cookson v. Price*, 914 N.E.2d 229, 232 (Ill. App. Ct. 2009) (holding that it was error for the trial court to refuse to permit plaintiff to amend his complaint to include a new affidavit and report complying with section 2-622 where there was no indication that the plaintiff's failure to file the report earlier in the litigation was in bad faith). Further, it did not explain whether or in what manner the defendants might be prejudiced by permitting the plaintiffs to replead. *See Christmas v. Dr. Donald W. Hugar, Ltd.*, 949 N.E.2d 675, 684 (Ill. App. Ct. 2011) (listing prejudice to the other party as one of the factors that a trial court should consider in determining whether to grant leave to amend a complaint that did not comply with section 2-622). On this record, we decline to affirm the district court's decision to dismiss the claim with prejudice. *Cf. Apa*, 680 N.E.2d at 805 (overturning for abuse of discretion a trial court's decision to dismiss a claim with prejudice for failure to comply with section 2-622 because "the trial court failed to take into consideration the particular facts and unique circumstances of this case," where there was no indication that the plaintiff was bringing a frivolous claim and no suggestion of bad faith or abuse of process).

Finally, the district court's conclusion that the plaintiffs could not timely file an amended complaint—attaching a proper affidavit and report—because the statute of limitations had lapsed on their wrongful death claim fails to take into account the possibility that the amendment would relate back to the plaintiffs' initial, timely complaint. *Cf.* Fed. R. Civ. P. 15(c) (explaining the doctrine of relation back). We take no position on whether relation back would permit amendment

under the specific circumstances of this case;[37] we only note

---

[37] On remand, the district court may be guided by both federal and state relation back rules. Federal Rule of Civil Procedure 15(c)(1) provides in relevant part:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> > (A) the law that provides the applicable statute of limitations allows relation back; [or]
> >
> > (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading … .

Thus, either Illinois law (which supplies the statute of limitations for the plaintiffs' wrongful death claim here) or Federal Rule of Civil Procedure 15(c)(1)(B) could determine whether an amended pleading relates back to the plaintiffs' initial pleading. *See* Fed. R. Civ. P. 15 advisory committee's note to the 1991 amendment ("Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim."); *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 236 (7th Cir. 1996).

There is no meaningful distinction, however, between Illinois law on relation back and Federal Rule of Civil Procedure 15(c)(1)(B). *See Henderson v. Bolanda*, 253 F.3d 928, 932–33 (7th Cir. 2001) ("Illinois law on relation back is not more forgiving [than federal law]."). Illinois permits relation back when the same two requirements are met: "(1) the original complaint was timely filed, and (2) the amended complaint grew out of the same transaction or occurrence set forth in the original pleading." *Id.*; *see also Porter v.*

(continued...)

that the district court's failure to address the plaintiffs' properly raised argument,[38] combined with our preference for permitting amendment in this type of case and the lack of factual findings described above, constituted an abuse of discretion.[39]

---

[37] (...continued)
*Decatur Mem'l Hosp.*, 882 N.E.2d 583, 591–92 (Ill. 2008) (recognizing similarities between Illinois and federal law on relation back).

[38] *See* R.46 at 3.

[39] There are several reasons for requiring the plaintiffs to amend their complaint, rather than allowing them simply to file the required affidavit and report upon remand. First, the operative pleading in the district court at the time the final judgment was entered was the Second Amended Complaint, which did not include a wrongful death claim. If this claim is to be reinstated, it needs to be repleaded.

Second, the Illinois courts that have been confronted with a defective affidavit and report have required amendment, not just the filing of a new affidavit and report once the deficiency has been uncovered. *See, e.g., Apa v. Rotman*, 680 N.E.2d 801, 804 (Ill. App. Ct. 1997). The Illinois courts liberally permit amendments in order to prevent technical filing rules from cutting off a plaintiff's ability to pursue a meritorious claim. *See Cammon v. W. Suburban Hosp. Med. Ctr.*, 704 N.E.2d 731, 738–39 (Ill. App. Ct. 1998). That policy is furthered by requiring amendment here. The plaintiffs never satisfied all of the requirements for bringing a wrongful death claim; because the statute of limitations on that claim has expired, they are unable to bring the claim unless amendment is permitted. If their claim has merit, then not permitting amendment would cut off a claim because of a technical filing rule.

Finally, this approach appears to be consistent with the statute, which
(continued...)

## C.

We now turn to the district court's summary judgment decision. As previously discussed, the district court granted summary judgment to the defendants on all claims that remained after their respective motions to dismiss were denied. The plaintiffs confine their appeal, however, to the district court's grant of summary judgment (1) to Sheriff Walsh, on the plaintiffs' § 1983 claims against him in his official capacity; and (2) to HPL, on the plaintiffs' § 1983 claim against the organization.

Our standard of review is clear. We shall affirm the district court's grant of summary judgment if, exercising de novo review and construing all facts and inferences in favor of the plaintiffs, there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. *Guzman*

---

[39] (...continued)

identifies specific situations—not including the one presented here—where a plaintiff may file an affidavit and report late and without amending his complaint. For example, 735 ILCS 5/2-622(a)(2) provides that where an affidavit and report cannot be obtained in a timely fashion and the limitations period is about to expire, the plaintiff may submit with the complaint only an affidavit explaining the situation, and the required affidavit and report confirming the claim's merit may be filed within ninety days. Subsection 5/2-622(a)(3) similarly states that if a plaintiff cannot obtain the required affidavit and report because a party has failed to produce necessary records as required by statute, the plaintiff may submit with the complaint only an affidavit explaining the situation, and the required affidavit and report confirming the claim's merit may be filed within ninety days. If the legislature wanted litigants in the plaintiffs' situation to proceed without filing an amended complaint, it could have included a specific subsection authorizing such a course of action.

*v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

**1.**

The plaintiffs submit that Sheriff Walsh was deliberately indifferent primarily for failing to ensure that medical staff had a "written policy or procedure for diabetic detainees whose blood sugar was not being measured and who refused to eat."[40] Because the plaintiffs have sued Sheriff Walsh in his official capacity, they must show (1) that a genuine issue of material fact exists as to whether he "maintains a policy or custom that infringes upon the rights protected" by the Fourteenth Amendment's Due Process Clause; and (2) that "a genuine issue of material fact exists as to whether [the death] was proximately caused by either an official policy of the municipality or from a governmental custom or usage." *Pittman ex rel. Hamilton v. Cnty. of Madison, Illinois*, 746 F.3d 766, 780 (7th Cir. 2014) (internal quotation marks omitted); *see also Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (holding that the "policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation"). A plaintiff can show that a municipality has caused a constitutional injury either "by demonstrating that [the municipality's] policy itself is unconstitutional," or "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to

---

[40] Appellants' Br. 27.

have noticed what was going on and by failing to do anything must have encouraged or at least condoned … the misconduct of subordinate officers." *Estate of Novack*, 226 F.3d at 531 (internal quotation marks omitted).

If a plaintiff's allegation is that an express municipal policy violates the constitution when enforced, then a single incident may be sufficient to sustain liability for the municipality under § 1983. *See Calhoun v. Ramsey*, 408 F.3d 375, 379–80 (7th Cir. 2005). However, where, as here, the plaintiffs are concerned with a *lack* of policies, we look for "more evidence than a single incident to establish liability." *Id.* at 380. Without evidence that a series of incidents brought the risk at issue to the attention of the policymaker, we cannot infer that the lack of a policy is the result of deliberate indifference because "[t]he absence of a policy might … mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action." *Id.*

In this case, the plaintiffs have not shown that there was a "series of unconstitutional acts from which it may be inferred that the [sheriff] knew [CCCC] officers were violating the constitutional rights of [CCCC] inmates and did nothing." *Estate of Novack*, 226 F.3d at 531. Before the district court, the plaintiffs alleged that the following put Sheriff Walsh on notice of the unconstitutional practices in the jail:

> (1) [S]even inmates previously died in the jail, including Quentin Larry, who Plaintiffs contend died because of deficiencies in the intake process at the jail; (2) Swain's email regarding the problems

> with Janet during her May 2007 incarceration was
> sent to "Corrections" so Walsh should have received
> it; (3) Walsh was personally notified by letter, fax
> and a telephone conversation with Plaintiffs' counsel
> in May 2006 about complaints a diabetic inmate,
> Joey Morrissey, had about how treatment for his
> diabetes was handled at the jail, to which Walsh
> responded following an investigation … .[41]

The problem with these contentions is that none of them
support the conclusion that the sheriff was on notice that the
custom of which the plaintiffs complain on appeal—the
sheriff's lack of policies for treating a diabetic detainee who
refuses to participate in her own care—could cause death as a
result of diabetic ketoacidosis. Although seven individuals had
died in the CCCC, none had died because of complications
from diabetes. In *Pittman*, 746 F.3d at 780, we held that thirty-
six failed suicide attempts and three suicides were not
enough—standing alone—to show that a sheriff's suicide-
prevention policies were inadequate because the fact that other
inmates attempted suicide did not necessarily show a defi-
ciency in those policies. Similarly, in this case, the seven deaths
referenced by the plaintiffs—notably, deaths from different
causes than Mrs. Hahn's—do not show that Sheriff Walsh was
"aware of any … risk posed by [his] policies or that
[Sheriff Walsh] failed to take appropriate steps to protect
[Mrs. Hahn]." *Id.*

---

[41] R.165 at 39–40. The additional reasons raised to the district court by the
plaintiffs are unrelated to the specific policy they allege on appeal is
lacking.

Swain's e-mail dealt with a single incident, not a "series," and it did not describe any adverse effects on Mrs. Hahn's health caused by the policies in place. At best, it showed that one member of HPL's nursing staff experienced a temporary difficulty with one detainee. *See Calhoun*, 408 F.3d at 380 (noting that the same problem needs to have come up multiple times to put a municipality on notice that a policy may need to be implemented to address the situation). The complaint by counsel on behalf of the earlier detainee, Morrissey, is similarly flawed. It does not show that detainees suffered a serious risk of harm, only that one detainee was dissatisfied with his treatment. Moreover, Morrissey's situation would not have put Sheriff Walsh on notice that he might need a policy for handling diabetic inmates who refuse to participate in their own care, because those circumstances were not presented in Morrissey's situation.

We contrast this case with *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012), where we held that summary judgment was inappropriate for a municipality where there was evidence that officials were on notice that the municipality's medical policies were causing serious problems at the jail. There, the plaintiff challenged the jail's policy of taking detainees off of their prescribed medications and transitioning them to preferred medications absent proper supervision by a physician. *Id.* at 1020–21. We held that there was a triable issue of fact as to whether the municipality was aware of the problem because several newspaper articles had addressed it and the sheriff had publicly acknowledged his awareness of the problem. *Id.* at 1021. Unlike in *King*, the plaintiffs here do not point to any evidence that Sheriff Walsh knew that there was a problem

with diabetic detainees refusing to participate in their own care and, as a consequence, suffering serious medical ramifications.

The record before us suggests that any deliberate indifference that *may* have occurred in this case was at the hands of the individual correctional officers or HPL employees who interacted with Mrs. Hahn.[42] Such evidence is legally insufficient to impose liability under § 1983 on the CCCC's policymakers. *See Holmes v. Sheahan*, 930 F.2d 1196, 1201–02 (7th Cir. 1991) ("[W]ithout more evidence pointing to deficiencies in these procedures, [the plaintiff's] story suggests a problem with personnel and the implementation of policy, … but not a problem with County policy itself."). We must conclude that the district court properly granted summary judgment on the official capacity claim against Sheriff Walsh.

**2.**

The plaintiffs next submit that the district court erred in granting summary judgment to HPL. They first contend that, contrary to established precedent set forth in *Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982), and subsequent cases, HPL should be liable for the actions of its employees under a respondeat superior theory of liability. Second, they submit that even if HPL is not liable under a respondeat

---

[42] *Cf. Egebergh v. Nicholson*, 272 F.3d 925, 927–28 (7th Cir. 2001) (holding that there was a genuine issue for trial regarding whether individual officers who withheld insulin from a diabetic detainee were deliberately indifferent); *Estate of Gee ex rel. Beeman v. Johnson*, 365 F. App'x 679, 683–84 (7th Cir. 2010) (same).

superior theory of liability, the company is liable under a direct theory of liability because its policies and procedures for treating diabetic detainees were deliberately indifferent to the needs of those individuals. We shall address each of these contentions.

**a.**

The plaintiffs submit that they should be able to pursue a claim under § 1983 against HPL for its employees' misconduct. In their view, we have erred in extending the limitation on municipal liability established in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), to private actors. *Monell* permits suits against municipal entities under § 1983, but only when a governmental policy or custom caused the constitutional deprivation; municipal entities cannot be liable for their employees' actions under a respondeat superior theory. *Id.* at 691. Our cases have extended this limitation to private entities. *See, e.g.*, *Iskander*, 690 F.2d at 128 ("Moreover, just as a municipal corporation is not vicariously liable upon a theory of *respondeat superior* for the constitutional torts of its employees, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." (citation omitted)); *see also Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010) (noting that "a corporation that contract[s] with [a] jail to provide medical services … is treated the same as a municipality for liability purposes under § 1983"). The plaintiffs ask us to "revisit these holdings" because they are based on "historical

misreadings" and we are "free to revisit and reject [our] extension of *Monell* to private corporations."[43]

As a preliminary matter, the plaintiffs have waived the issue of HPL's respondeat superior liability because they failed to raise it before the district court. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). In their appellate brief, the plaintiffs state, "The district court granted summary judgment to defendant Health Professionals Ltd. ('HPL') by applying the rule that respondeat superior does not apply to Section 1983 claims brought against private corporations."[44] The district court made no mention of any such contention. Furthermore, the plaintiffs have identified no part of the district court record in which a respondeat superior claim was raised or otherwise discussed.

We raised the matter of waiver at oral argument, and plaintiffs' counsel subsequently submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j) contending that the respondeat superior argument was not waived because a court of appeals may review "'the merits of each and every theory the district judge relied upon in deciding the case.'"[45] Essentially, the plaintiffs now argue that the district court impliedly

---

[43] Appellants' Br. 32–35 (internal quotation marks omitted).

[44] *Id.* at 15.

[45] App. R. 50 (Letter from Kenneth N. Flaxman to Gino J. Agnello, Clerk, United States Court of Appeals for the Seventh Circuit (Apr. 15, 2014) (quoting *United States v. City of Chicago*, 869 F.2d 1033, 1036 (7th Cir. 1989)) (citing *Pittman v. Warden, Pontiac Corr. Ctr.*, 960 F.2d 688, 690–91 (7th Cir. 1992))).

rejected a theory of respondeat superior liability by granting summary judgment to HPL. This assertion cannot prevail. The plaintiffs' complaint raised only *direct* claims against HPL.[46] In their opposition to HPL's motion for summary judgment, the plaintiffs again discussed only *direct* claims against HPL.[47] We simply have no basis upon which to infer that the district court had even considered, much less had relied upon, the rule that private corporations cannot be held liable in § 1983 actions under a respondeat superior theory of liability.

Even if we were to reach the respondeat superior issue, we would not take the position urged by the plaintiffs. The plaintiffs point to no "intervening on-point Supreme Court decision" that would permit us to overrule our prior cases. *De Leon Castellanos v. Holder*, 652 F.3d 762, 765 (7th Cir. 2011). Our considered decision in *Iskander* is compatible with the holding of every circuit to have addressed the issue. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790 & n.2 (7th Cir. 2014) (collecting cases).

---

[46]  *See* R.42 at 8 ("[T]his defendant, acting with deliberate indifference and/or negligence, among other things, failed to develop and implement adequate policies and procedures with the foreseeable result that pretrial detainees like Janet would not be identified and would not receive appropriate treatment and monitoring.").

[47]  *See* R.144 at 88 (discussing how a supervisory defendant may be liable under § 1983 for failing to establish customs or policies to ensure that unconstitutional practices do not occur or for establishing customs or policies that lead to unconstitutional practices); *id.* at 89 (arguing that HPL unlawfully took no action in response to knowledge that its policy for treating diabetes was inadequate).

Because the issue was waived or, alternatively, because it fails on the merits, we conclude that the plaintiffs' argument for holding HPL liable on a respondeat superior theory is unavailing.

**b.**

We next assess the plaintiffs' direct claims against HPL. "Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). As with municipal defendants (like Sheriff Walsh, in his official capacity), the plaintiff "must show that his injury was the result of the … corporation's official policy or custom." *Id.* The plaintiff must identify a policy:

> An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation.

*Id.* The plaintiff also must establish a causal link between the corporation's policy (or lack of policy) and the plaintiff's injury. *Id.*

The plaintiffs here submit that three of HPL's policies caused constitutional violations: (1) the policy of not requiring HPL employees to obtain detainees' medical records; (2) the

policy of administering insulin according to a generic sliding scale; and (3) the policy of ignoring erroneous readings from the blood sugar monitoring machines.

The first two of these arguments fail because the plaintiffs cannot demonstrate the requisite causation. The plaintiffs present no evidence that obtaining Mrs. Hahn's medical records would have saved her life. HPL and CCCC personnel already knew that Mrs. Hahn was an insulin-dependent diabetic who was irresponsible with her medications. Indeed, the plaintiffs do not argue that having Mrs. Hahn's records would have prevented her death. Nor do the plaintiffs argue that HPL's insulin-dosage policy caused her death. They argue that the policy was problematic in the abstract but concede that it did not cause Mrs. Hahn's death here. If it had, the cause of death would have been hypoglycemia (low blood sugar), not diabetic ketoacidosis.[48]

The plaintiffs' third contention deserves independent examination. Unlike their other contentions, there is a link here between the failure to provide an alternative method of checking a detainee's blood sugar and Mrs. Hahn's death: On the day before her death, she consented on one occasion to having her blood sugar checked, only to have that option taken

---

[48] Specifically, the plaintiffs' expert found fault in Swain's administration of twenty units of insulin based on HPL's sliding scale, which he believed "could have killed her in a different manner—with hypoglycemia, or low blood sugar." Appellants' Br. 36–37. This is because some Type-1 diabetics are particularly sensitive to insulin; therefore, twenty units might have been much more than needed and could have caused Mrs. Hahn's blood sugar to plummet. *See id.* at 37.

away from her when the machine would not work. It is possible that if CCCC or HPL staff had been able to obtain a reading from Mrs. Hahn at the time she consented to be checked, that reading might have indicated that she was in need of immediate treatment. In the plaintiffs' view, it was constitutionally actionable for HPL to have failed to provide a method for monitoring the blood sugar levels of diabetic detainees when an Accu-Chek machine fails to produce a reading.

HPL had a policy in place for rechecking an individual's blood sugar when the Accu-Chek machine returned an error message; the existence of that policy indicates that HPL was aware that, on occasion, the Accu-Chek machine would not render an accurate reading. The record shows, however, that such a malfunction could have been due to a variety of causes, such as the use of an insufficient amount of blood, improper insertion of the stick containing blood into the Accu-Chek machine or a broken machine. Some of these causes are due to operator error or other circumstances not necessarily linked to a defect in the machine itself and therefore do not result in § 1983 liability. *Cf. Rice*, 675 F.3d at 676 (noting that where "most of the errors and omissions" cited by the plaintiffs were about how staff handled the detainee's medical condition, there could be no liability for the policymaker). Absent evidence that the machine was inoperable a significant number of times and that its predicable failure to operate was due to a malfunction of the machine itself, a jury could not find that the company's failure to maintain an alternate testing device to check diabetics' blood sugar levels on a regular basis was deliberately indifferent. *See Shields*, 746 F.3d at 796 (observing

that isolated incidents do not "support an inference of a custom or policy," as is required to find a corporation liable for deliberate indifference under § 1983).

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court with respect to the applicability of 735 ILCS 5/2-622 in federal district courts. We reverse the district court's decision to dismiss the plaintiffs' wrongful death claim with prejudice. We affirm the district court's grant of summary judgment to Sheriff Walsh and to HPL. The case is remanded to the district court for further proceedings consistent with this opinion. Each party will bear its own costs in this appeal.


AFFIRMED in part, REVERSED and REMANDED in part

NO COSTS IN THIS COURT